# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 6, 2009

Charles R. Fulbruge III
Clerk

No. 07-11029

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

MARSHA AUGUST OLLISON

Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before WIENER, GARZA, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

Defendant-Appellant Marsha August Ollison was charged by indictment with three counts of theft from an organization receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(A). A jury found Ollison guilty of all three counts, and the district court sentenced her to an eighteen-month term of imprisonment and a three-year term of supervised release. Ollison was also ordered to pay restitution in the amount of $64,633.

Dallas Independent School District (DISD) receives more than $10,000 in each fiscal year from the federal government in the form of educational or block grants. As an employee of DISD, Ollison was given a credit card, known as a procurement card (P-Card), in order to make official purchases on behalf of

DISD. The jury found that Ollison used her P-Card to make unauthorized personal purchases exceeding $5,000 in each of the three fiscal years alleged in the indictment. For sentencing and restitution purposes, the district court found that Ollison used her P-Card to make personal purchases totaling approximately $64,633 during the relevant time period.

Ollison raises six issues challenging her conviction and sentence. Ollison argues that: (1) there is not legally sufficient evidence that she defrauded DISD of at least $5,000 in each fiscal year alleged in the indictment; (2) the district court erred in refusing to dismiss the indictment because it is unconstitutional to apply § 666 to low-level employees like herself; (3) the district court abused its discretion in allowing Special Agent Steven Sepeda to testify as a summary witness and to express his lay opinion regarding whether certain purchases were official or personal; (4) the district court improperly instructed the jury that Jimmy Talley, a defense witness, was not testifying as an expert; (5) the district court clearly erred in determining the loss amount for sentencing purposes and plainly erred in calculating the restitution amount; and (6) the district court clearly erred when it found that Ollison was subject to a two-level sentencing enhancement for abuse of a position of trust.

For the reasons explained below, we affirm the conviction but reverse the sentence and remand with instructions not to apply the enhancement for abuse of a position of trust.

## I. FACTUAL & PROCEDURAL BACKGROUND

Ollison worked for DISD as a secretary in the office of the Superintendent. DISD received significantly more than $10,000 in each fiscal year from the federal government in the form of educational or block grants. The federal funds were used to pay the day-to-day expenses of DISD, including salaries, operating expenses, transportation, books, supplies, and equipment.

The P-Card program began in the late 1990s and ended in July 2006. Approximately 1,200 employees of DISD received P-Cards, which were only intended for official DISD purchases. Ollison signed a written agreement that the P-Card would not be used for personal purchases. This agreement stated the following: "I understand that under no circumstances will I use the procurement card to make personal purchases, either for others or myself." P-Card holders were required to maintain the original receipts for all purchases, which DISD could audit at unspecified times. When P-Card holders received a statement, they forwarded it to the DISD finance department, which directly paid the bill with DISD funds.

During the fiscal year ending June 30, 2004, Ollison's P-Card was used to make $14,093 in purchases. During the fiscal year ending June 30, 2005, it was used to make $52,007 in purchases, and during the fiscal year ending June 30, 2006, it was used to make $26,641 in purchases. The total amount charged on her P-Card during the three-year period was $92,742. Ollison was required to immediately reimburse DISD for any unauthorized personal purchases made with her P-Card, but she never reimbursed DISD for any of her purchases.

The Superintendent terminated the P-Card program in July 2006 after the Dallas Morning News ran a story detailing abuses in the P-Card program. This article revealed that numerous DISD employees used their P-Cards to make personal purchases. The Superintendent sent letters to all P-Card holders requesting that all receipts and records for 2004 though 2006 be submitted to the DISD legal office. Subsequently, the Superintendent expanded this disclosure request to include receipts and records for 2003 to 2004.

Special Agent Steven Sepeda of the FBI investigated whether Ollison violated federal law through her misuse of the P-Card. Sepeda testified at trial that he had an M.S. degree in accounting from the University of North Texas, and that he is a CPA. He worked in the financial departments of several private

companies before joining the FBI approximately three years before trial, and he received training in forensics, fraud and corporate fraud, and had taught college accounting courses. Although Sepeda informed the jury of his professional qualifications, which suggested that he was an expert witness, he actually testified as a lay witness.

A comparison of the bank statements to the receipts revealed that, of a total of 756 transactions, Ollison submitted only 360 receipts. Of the 360 receipts she submitted, some 91 had been altered. Some receipts had information obscured with correction fluid or handwriting, some were cut to remove information, and others were complete fabrications or did not add up to the totals indicated. Sepeda testified that when he compared Ollison's spending patterns to other DISD employees with similar job positions, he did not identify any other similarly situated employee with spending comparable to Ollison.

Many of the receipts that Ollison did submit were consistent with personal use. These receipts included numerous clothing purchases from Dillard's department store, women's clothing and accessories from Marshall's and TJ Maxx Stores, including several "layaway" accounts. The receipts also included numerous grocery store and drug store purchases of items of a personal nature. Many of these receipts indicated that the purchase occurred in the evening or during the weekend.

On September 8, 2006, Sepeda and other investigators executed a search warrant at Ollison's residence. She was present and consented to speak with investigators after being advised of her Miranda rights. She admitted to the investigators that she had used her P-Card for personal purchases, explaining that "it just got comfortable, it got easy." She admitted that she used her P-Card for "routine grocery shopping" and for buying clothes, household accessories, and home internet service. She also acknowledged that she altered some receipts submitted to DISD. Ollison identified items in her residence that she had

purchased with her P-Card. The investigators seized the items identified by Ollison and other items listed in the search warrant, including a DVD player, clothing items, fifty-six vases, and several framed prints.

Through interviews with Ollison's supervisors, Sepeda determined that Ollison was responsible for buying snacks for the office, such as candy, soda and coffee. She was also charged with purchasing condiments and flatware, arranging for catering through approved vendors, and providing for receptions.

At trial, Sepeda categorized Ollison's individual charges on her P-Card into one of three categories: personal expense, DISD expense, or undetermined expense. He considered a variety of factors in reaching his conclusions: (1) the identity of the vendor; (2) the location of the vendor; (3) whether DISD had an approved vendor for the item purchased; (4) the day and time of purchase; (5) whether the receipt had been altered or fabricated; (6) whether a receipt had, in fact, been submitted by Ollison; (7) whether there were additional items on the same receipt; (8) whether there was a pattern of purchases; (9) whether sales tax was paid or a tax-exempt certificate was used for the purchase; and (10) Ollison's admissions to investigators. Sepeda testified that he considered all these factors when evaluating each individual charge, and that none of them were dispositive in making his conclusions.

Based on his review, Sepeda determined that (1) during the fiscal year ending June 30, 2004, Ollison's P-Card was used to make $12,436 in personal purchases; (2) during fiscal year ending June 30, 2005, it was used to make $28,373 in personal purchases; and (3) during fiscal year ending June 30, 2006, it was used to make $15,480 in personal purchases.

The defense presented Dr. Al Sullivan, a retired school administrator who worked at DISD from 1970 to 2005. He testified that he was experienced in conducting educational audits to ensure that the school district money was being

spent properly. Sullivan identified various items that could have been legitimately purchased by Ollison for official DISD purposes.

The defense also presented Jimmy Talley, CPA, who testified that he had reviewed the Government's exhibits and Ollison's receipts. Talley stated that it was impossible to determine if a purchase was personal based on the receipts alone. Talley stated that in order to determine whether a purchase was official or personal, the following steps would need to be taken: (1) call the vendor; (2) send a confirmation to the vendor; (3) interview additional DISD employees; (4) study internal controls of DISD; (5) determine the accuracy of the receipt; and (6) determine what happened to the item. Talley testified that without following these six steps, any classification of a purchase as official or personal would be speculative.

## II. ANALYSIS

### A. Sufficiency of the Evidence

#### 1. Standard of Review

Because Ollison moved for a judgment of acquittal prior to the submission of the case to the jury, her sufficiency claim is reviewed de novo. United States v. Alarcon, 261 F.3d 416, 421 (5th Cir. 2001). In assessing a challenge to the sufficiency of the evidence, we must determine whether, "viewing all the evidence in the light most favorable to the verdict," a rational jury "could have found that the evidence established the elements of the offense beyond a reasonable doubt." United States v. Villarreal, 324 F.3d 319, 322 (5th Cir. 2003). "All reasonable inferences must be drawn, and all credibility determinations made, in the light most favorable to the verdict." Id. If, however, "the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, the conviction should be reversed." United States v. Mackay, 33 F.3d 489, 493 (5th Cir. 1994) (citation omitted).

2.    Merits

Section 666 "prohibits theft or bribery concerning programs receiving federal funds."[1]  United States v. Westmoreland, 841 F.2d 572, 574 (5th Cir. 1988).  "The Supreme Court has described the coverage of § 666 as 'expansive, both as to the [conduct] forbidden and the entities covered.'" United States v. Hildenbrand, 527 F.3d 466, 477-78 (5th Cir. 2008) (quoting Fischer v. United States, 529 U.S. 667, 678 (2000)).  The legislative history indicates that § 666 was designed "to protect the integrity of federal funds by punishing theft and

---

[1] In relevant part, 18 U.S.C. § 666 states:

(a) Whoever, if the circumstance described in subsection (b) of this section exists—

(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—
(A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that—
        (i) is valued at $5,000 or more, and
        (ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; . . .

. . . .

shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance . . . .

. . . .

(d) As used in this section—

(1) the term "agent" means a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative;

. . . .

bribery involving Federal programs for which there is a specific statutory scheme authorizing the Federal assistance in order to promote or achieve certain policy objectives."[2] United States v. Marmolejo, 89 F.3d 1185, 1190 (5th Cir. 1996) (quotation omitted).

Although the district court found that Ollison made $64,633 in personal purchases on her P-Card for sentencing and restitution purposes, the jury instructions made clear that the jury could convict if "the value of the property stolen, embezzled, knowingly converted, or intentionally misapplied was at least $5,000 in any one-year period as set forth in the Indictment."

Because Ollison admitted to using the P-Card for "routine grocery shopping," clothing, and home accessory purchases, it was reasonable for the jury to infer that all purchases falling within those general categories were personal because that inference was bolstered by the other factors identified by Sepeda and was not rebutted by evidence to the contrary. During the fiscal year ending on June 30, 2004, Ollison made grocery purchases and clothing purchases that exceeded the $5,000 threshold.[3] The same is true for the fiscal year ending on June 30, 2005,[4] and for the fiscal year ending on June 30, 2006.[5] Given Ollison's admissions, Sepeda's testimony, and the documentary evidence

---

[2] In Westmoreland, which involved the bribery prong of the statute, we held that "the direct involvement of federal funds in a transaction is not an essential element of bribery under section 666(b); the [G]overnment need not prove that federal monies funded a corrupt transaction." 841 F.2d at 578. Rather, the Government need only prove that the agency received federal funds during the relevant time period exceeding the statutory threshold, which is $10,000. Id. at 576. In United States v. Lipscomb, we stated that § 666 is broadly focused on deterring corruption in those agencies receiving substantial federal assistance, rather than narrowly focused on deterring the direct depletion of federal funds through theft or graft. 299 F.3d 303, 309 (5th Cir. 2002). Thus, it was unnecessary for the Government to prove that Ollison's theft from DISD resulted in the direct depletion of federal funds.

[3] Albertson's, $2,029; Tom Thumb, $2,266; Marshall's, $9,437.

[4] Albertson's, $5,863; TJ Maxx, $2,348.

[5] Albertson's, $3,370; Steinmart, $1,303; Target, $1,891.

introduced at trial, the evidence certainly does not lend "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence." See Mackay, 33 F.3d at 493.

Albeit de novo, sufficiency-of-the-evidence review is "highly deferential to the verdict," United States v. Harris, 293 F.3d 863, 869 (5th Cir. 2002), and does not depend on whether the evidence presented at trial is direct or circumstantial. United States v. Bryant, 770 F.2d 1283, 1288 (5th Cir. 1985). Furthermore, our inquiry is "limited to whether the jury's verdict was reasonable, not whether we believe it to be correct." United States v. Williams, 264 F.3d 561, 576 (5th Cir. 2001). Although Ollison's witness, Sullivan, testified that various purchases could have been official, the jury was entitled to discount or ignore that testimony. See United States v. Fuchs, 467 F.3d 889, 904 (5th Cir. 2006). We find that there was a legally sufficient evidentiary basis for the jury to conclude that Ollison made personal purchases on her P-Card exceeding $5,000 in each fiscal year alleged in the indictment. See Villarreal, 324 F.3d at 322.

B.    As-Applied Constitutionality of 18 U.S.C. § 666

1.    Standard of Review

The district court denied Ollison's motion to dismiss the indictment, in which she argued that § 666 is unconstitutional as applied to her. We review de novo the denial of the motion to dismiss the indictment and the underlying constitutional claim. See United States v. Kay, 513 F.3d 432, 440 (5th Cir. 2007); Lipscomb, 299 F.3d at 318.

2.    Merits

Because she was a secretary to the Superintendent, Ollison argues that she is not the type of employee who is covered by § 666. Citing to Westmoreland and Lipscomb, Ollison argues that § 666 is unconstitutional as applied to her because she is a "low-level employee," not an "administrator" who has authority to "effect significant transactions." See Sabri v. United States 541 U.S. 600, 608

(2004) (stating that in passing § 666, "Congress was within its prerogative to protect spending objects from the menace of local administrators on the take."). She argues that application of the theft prong of § 666 to her violates principles of federalism and exceeds Congress's authority under the Spending Clause, the Necessary and Proper Clause, the Commerce Clause, and the Tenth Amendment.

Ollison's argument is in tension with the plain language of the statute, which states that "the term 'agent' . . . in the case of an organization or government, includes a servant or employee . . . ." See 18 U.S.C. § 666(d)(1) (emphasis added). The statute itself does not distinguish between "high-level" and "low-level" employees. Cf. Salinas v. United States, 522 U.S. 52, 57 (1997) ("The statute's plain language fails to provide any basis for limiting § 666(a)(1)(B) to bribes affecting federal funds."). When construing § 666 in the past, we have consistently applied the statute in accordance with its plain language. See Westmoreland, 841 F.2d at 576. Furthermore, if we were inclined to carve out an exception for "low-level employees," it would create a circuit split. See United States v. Sotomayor-Vazquez, 249 F.3d 1, 10 (1st Cir. 2001) ("[Section] 666 has been given a wide scope, to include all employees 'from the lowest clerk to the highest administrator.'") (quoting United States v. Brann, 990 F.2d 98, 101 (3d Cir. 1993)).

Despite being contrary to the plain language of the statute and persuasive authority, Ollison's argument is arguably supported by the following language in Westmoreland:

> [T]he statute does not encompass every local bribery as Westmoreland suggests. Although the extent of the federal government's assistance programs will bring many organizations and agencies within the statute's scope, the statute limits its reach to entities that receive a substantial amount of federal funds and to agents who have the authority to effect significant transactions.

Westmoreland, 841 F.2d at 578 (emphasis added); accord Lipscomb, 299 F.3d at 335-36. Furthermore, in Lipscomb, when evaluating a similar argument, we identified the defendant's "high rank and his broad influence over many programs that receive federal funds" as a federal interest justifying application of § 666 to his conduct. 299 F.3d at 336. 45

Ollison made a total of $92,742 in official and personal purchases over a three-year period with her P-Card. Ollison used her P-Card to steal at least $15,000 (according to the jury) and as much as $64,633 (according to the judge) from DISD, which was the direct recipient of federal funds.[6] Based on the particular facts of this case, we find that Ollison's conduct falls within the ambit of § 666.

Section 666 is constitutional as applied to the facts of this case; the statute does not exceed Congress's authority under the Spending Clause, the Necessary and Proper Clause, or the Tenth Amendment. See Lipscomb, 299 F.3d at 318-35. Although there was a dissenting opinion in Lipscomb, the federal interest in protecting the integrity of the DISD procurement system is more readily apparent than the federal interest at stake in Lipscomb. Cf. id. at 369 (Smith, J., dissenting). Because DISD used its sizable federal grants to fund day-to-day expenses, it cannot be said that Ollison's misuse of her P-Card "ha[s] no relationship whatsoever to federal funds and programs." Id. at 372.

Ollison's conduct "is indeed reasonably related to a federal interest, and thus is necessary and proper to Congress's exercise of its spending power." Id. at 336 (italics omitted). The Tenth Amendment does not alter this conclusion. Id. at 318. Because "Congress' authority to enact § 666 rests on the Spending

---

[6] Ollison cites to language suggesting that the term "agent" should be narrowly construed based on "how organizationally removed the employee is from the particular agency that administers the federal program." See Lipscomb, 299 F.3d at 314 (citation omitted). In this case, however, Ollison was not "organizationally removed" from DISD, which was the direct recipient of federal funds.

Clause of the Constitution," Ollison's Commerce Clause challenge to the statute must also fail. United States v. Phillips, 219 F.3d 404, 414 (5th Cir. 2000).

C. Evidentiary Objections to Special Agent Sepeda's Testimony

1. Standard of Review

"Admission of evidence, including summaries and summary testimony, is reviewed for abuse of discretion." United States v. Harms, 442 F.3d 367, 375 (5th Cir. 2006). Even if the district court errs in its evidentiary ruling, the error can be excused if it was harmless. United States v. Hart, 295 F.3d 451, 454 (5th Cir. 2002). "A nonconstitutional trial error is harmless unless it had substantial and injurious effect or influence in determining the jury's verdict." Id. (internal quotation marks omitted).

2. Merits

a. Demonstrative Exhibits

The district court not abuse its discretion in allowing the Government to proffer demonstrative exhibits 65, 67, and 69. "[A]llowing the use of charts as 'pedagogical' devices intended to present the government's version of the case is within the bounds of the trial court's discretion to control the presentation of evidence under [Federal Rule of Evidence] 611(a)." Harms, 442 F.3d at 375 (quotation omitted and emphasis added). "[S]uch charts are not admitted into evidence and should not go to the jury room absent consent of the parties." Id. (quotation omitted). "If a summary or chart is introduced solely as a pedagogical device, the court should instruct the jury that the chart or summary is not to be considered as evidence, but only as an aid in evaluating evidence." Id. (citation omitted).

Demonstrative exhibits 65, 67, and 69 accurately reflected Sepeda's opinion testimony regarding those purchases that he regarded as personal. Summary charts premised on the Government's assumptions are permissible as long as supporting evidence has been presented to the jury, and the jury is

instructed that it must determine what weight the evidence should be given. United States v. Jennings, 724 F.2d 436, 442 (5th Cir. 1984). In this case, demonstrative exhibits 65, 67, and 69 did not allow the Government "to assume that which it was required to prove beyond a reasonable doubt as operative facts of the alleged offense." Cf. United States v. Taylor, 210 F.3d 311, 316 (5th Cir. 2000). Rather, Sepeda's conclusions regarding whether a given purchase was personal was based on his multi-factor test, Ollison's admissions, his search of Ollison's residence, and his review of the receipts. Cf. Hart, 295 F.3d at 456 (holding that there was a "total absence of any independent testimony to support [the witness's] assumptions in preparing [the demonstrative exhibits]"). Furthermore, the district court instructed the jury that "[e]xhibits 65, 67, and 69 were demonstrative aids only" and that "[t]he evidence relevant to expenditures regarding the P-Card are Exhibits 8, 9, 10, and 11, which have previously been admitted into evidence."[7]

      b.    Summary Witness

Sepeda testified as a summary witness and referred to several demonstrative exhibits during his testimony. "For complex cases, we have allowed summary witnesses in a limited capacity." United States v. Fullwood, 342 F.3d 409, 413 (5th Cir. 2003). After reviewing Sepeda's testimony, we conclude that the district court did not abuse its discretion in permitting Sepeda's summary testimony. The evidence presented was voluminous and presented an appreciable degree of complexity. See Harms, 442 F.3d at 376. Sepeda's summary testimony was supported by the evidence, and we are not persuaded that it implicates the concerns that we have previously expressed about the improper use of summary testimony. See Fullwood, 342 F.3d at 413-14.

---

[7] The district court refused to admit demonstrative exhibits 65, 67, and 69 as summaries under Federal Rule of Evidence 1006. See Harms, 442 F.3d at 375-76.

13

### c. Opinion Testimony

Sepeda gave opinion testimony as a lay witness under Federal Rule of Evidence 701, not as an expert witness under Federal Rule of Evidence 702. Rule 701 states:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

"[T]he distinction between lay and expert witness testimony is that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." United States v. Yanez Sosa, 513 F.3d 194, 200 (5th Cir. 2008) (internal quotations omitted).

The Government argues that Sepeda's testimony regarding Ollison's admissions and his search of her residence was merely descriptive, and his opinion testimony regarding whether the purchases were personal was based on his common-sense application of various factors that any lay person would consider relevant. We need not decide whether Sepeda's testimony "exceeded the bounds of permissible lay opinion testimony" because the error, if any, was harmless. Id. at 200-01. Sepeda was qualified to testify as an expert, and the district court did not abuse its discretion in determining that his opinion testimony, whether lay or expert, would assist the jury in evaluating the evidence.

### D. District Court's Instructions regarding Jimmy Talley

#### 1. Standard of Review

The district court's decision on whether to admit expert opinion evidence is reviewed for abuse of discretion. United States v. Norris, 217 F.3d 262, 268-69 (5th Cir. 2000).

2.      Merits

During direct examination, Talley testified that Sepeda lacked sufficient information to determine whether Ollison's purchases were personal. Talley's opinion was based on four generally accepted accounting and auditing principles: (1) checking for authenticity, (2) support, (3) accuracy, and (4) completeness. Later on voir dire examination, Talley admitted that these four principles relate to the verification of documents, not on how to conduct an investigation. The Government objected to Talley providing expert testimony, arguing that Talley's expertise in accounting was not relevant to whether Sepeda's investigation was adequate. The district court sustained the objection and advised the jury as follows:

> Members of the jury, yesterday right before the break, the government had made an objection to Mr. Talley's testimony concerning certain accounting principles. The court sustains the government's objection. Mr. Talley will be testifying, however, he will not be testifying as an expert based upon the four accounting principles that you heard testified about yesterday.

After instructing the jury, the district court allowed Talley's lay opinion testimony regarding the adequacy of Sepeda's investigation, and the district court allowed Talley to testify regarding his qualifications as a CPA.

Ollison argues that the district court's instruction "degraded" Talley's testimony by stating that Talley was not an expert. She observes that the district court did not give a similar instruction regarding Sepeda's opinion testimony.

Because the district court was ruling on the Government's objection, we find that the error, if any, was harmless. See United States v. Johnson, 488 F.3d 690, 697-98 (6th Cir. 2007) ("Except in ruling on an objection, the court should

not, in the presence of the jury, declare that a witness is qualified as an expert or to render an expert opinion, and counsel should not ask the court to do so.") (citation omitted). Talley testified that generally accepted accounting and auditing principles are not directly relevant to critiquing an FBI investigation, and the jury still heard his lay opinion regarding the adequacy of Sepeda's investigation. The district court's instruction did not "degrade" Talley's testimony because both Talley and Sepeda testified as lay witnesses and gave their respective opinions.

E.    Loss Amount for Sentencing and Restitution Purposes

1.    Standard of Review

Factual determinations regarding loss amount for guideline calculation purposes are reviewed for clear error. United States v. Bieganowski, 313 F.3d 264, 294 (5th Cir. 2002). If a restitution award is legally permitted, it is normally reviewed for abuse of discretion. Norris, 217 F.3d at 271. However, because Ollison did not object to the restitution amount, it is reviewed for plain error. United States v. Olano, 507 U.S. 725, 732 (1993).

2.    Merits

The district court did not abuse its discretion in calculating the loss amount for sentencing purposes, or commit plain error in calculating the restitution amount. The Government was only required to prove the loss amount by a preponderance of the evidence. See Bieganowski, 313 F.3d at 294. The PSR set the loss amount at $64,633, which increased Ollison's base offense level by six. See U.S. SENTENCING GUIDELINES MANUAL § 2B1.1(b)(1) (2006). This six-level enhancement applies when the loss amount is more than $30,000 but less than $70,000. Ollison challenges the enhancement by making the same sufficiency-of-the-evidence argument that we previously rejected, and she claims that the appropriate loss amount should be $15,000, which is the minimum amount of loss sufficient to sustain her conviction.

"Generally, a PSR bears sufficient indicia of reliability to permit the sentencing court to rely on it at sentencing. The defendant bears the burden of demonstrating that the PSR is inaccurate; in the absence of rebuttal evidence, the sentencing court may properly rely on the PSR and adopt it." United States v. Ayala, 47 F.3d 688, 690 (5th Cir. 1995) (internal citation omitted). According to the PSR, the probation officer calculated the loss amount through review of the indictment, the investigative materials provided by the FBI, and an interview with Sepeda. We find that there is sufficient evidence for the district court to have concluded that the loss amount exceeded $30,000 for sentencing purposes. Sepeda's testimony was credible and supported by documentary evidence and Ollison's own admissions. For similar reasons, the district court did not plainly err in calculating the restitution amount.

F.   Sentencing Enhancement for Abuse of a Position of Trust

1.   Standard of Review

"The application of [U.S. Sentencing Guidelines Manual] § 3B1.3 is a sophisticated factual determination reviewed under the clearly erroneous standard." United States v. Fisher, 7 F.3d 69, 70-71 (5th Cir. 1993); see also United States v. Dial, 542 F.3d 1059, 1060 (5th Cir. 2008) (per curiam) (resolving an intra-circuit split regarding the applicable standard of review).

2.   Merits

Ollison received a two-level enhancement under § 3B1.3 for abusing a position of public or private trust in a manner that significantly facilitated the commission or concealment of the offense. Application Note 1 of § 3B1.3 states the following:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this

17

adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

"[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." Stinson v. United States, 508 U.S. 36, 38 (1993). The district court applied the enhancement for the following reasons: (1) although approximately 1,200 DISD employees had P-Cards, not every employee had one; (2) P-Card holders were in a position of trust because they used the card to make purchases on behalf of DISD; and (3) Ollison was secretary to the Superintendent, who was a high-ranking DISD official.[8] We conclude that the district court clearly erred in applying this enhancement to Ollison.

The § 3B1.3 enhancement is appropriate if (1) Ollison occupied a position of trust, (2) that she used to significantly facilitate the commission or concealment of the offense. United States v. Kay, 513 F.3d 432, 459 (5th Cir. 2007). Thus, the sentencing court must conduct a two-step inquiry when considering whether to apply the § 3B1.3 enhancement. "First, the court must determine whether the defendant occupied a position of trust at all. If not, the inquiry ends and no enhancement accrues. If, however, this initial query

---

[8] Although Ollison was secretary to the Superintendent, who was a high-ranking DISD official, the Government does not explain why the Superintendent's authority should be imputed to Ollison.

produces an affirmative response, the court must proceed to ascertain the extent to which the defendant used that position to facilitate or conceal the offense."[9] United States v. Reccko, 151 F.3d 29, 31 (1st Cir. 1998). The Reccko two-step inquiry is consistent with the law of this circuit. See Kay, 513 F.3d at 459 (describing it as a "two-part test"). In United States v. Brown, we stated: "By its terms, § 3B1.3 encompasses two [conjunctive] factors: (1) whether the defendant occupies a position of trust, and (2) whether the defendant abused his position in a manner that significantly facilitated the commission or concealment of the offense." 941 F.2d 1300, 1304 (5th Cir. 1991) (per curiam) (emphasis added). Logically, one must occupy a position of trust before one can abuse it.

### a. Position of Trust

To a lay person, it might appear that Ollison occupied a position of trust because she had limited authority to purchase various items with her P-Card. DISD "trusted" that Ollison would not use her P-Card to make personal purchases. However, if the § 3B1.3 enhancement relied on this colloquial definition of "position of trust," then most if not all employees who stole from their employers would be subject to the enhancement because the employers "trusted" that their employees would not steal. See United States v. Edwards, 325 F.3d 1184, 1187 (10th Cir. 2003) ("[T]he adjustment under § 3B1.3 is not intended to be routinely applied to every employee fraud or embezzlement case."); see also United States v. Garrison, 133 F.3d 831, 838 (11th Cir. 1998) (stating that "because there is a component of misplaced trust inherent in the concept of fraud, a sentencing court must be careful not to be 'overly broad' in

---

[9] The dissent "conflate[s] the requisite inquiries. Rather than asking, first, whether [Ollison] held a position of trust, and if so, whether she used that position to facilitate a crime, the [dissent] essentially determine[s] that [Ollison] held a position of trust precisely because her job enabled her to commit the crime." Reccko, 151 F.3d at 32. We do not believe that Ollison's secretary position embodied the kind of professional or managerial discretion that is the signature characteristic of a position of trust.

imposing the [§ 3B1.3] enhancement") (internal citation omitted). For purposes of this enhancement, a "position of trust" is a term of art that must be defined through reference to the guideline commentary and our case law. See Stinson, 508 U.S. at 38. A position of trust is characterized by (1) professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference), and (2) minimal supervision. See U.S. SENTENCING GUIDELINES MANUAL § 3B1.3 cmt. n.1 (2006); see also United States v. Brown, 7 F.3d 1155, 1161 (5th Cir. 1993) ("The primary trait that distinguishes a person in a position of trust from one who is not is the extent to which the position provides the freedom to commit a difficult-to-detect wrong").

According to the dissent, Ollison occupied a position of trust because "Ollison was given substantial autonomy to make purchases using her P-Card on behalf of the [Superintendent's] office." However, Ollison's discretionary authority to make official purchases on her P-Card was limited to a few discrete categories of inexpensive items.[10] The level of professional or managerial discretion held by Ollison is not commensurate with the level of discretion held by other defendants in this circuit who have been subject to the enhancement. Absent proof of other aggravating circumstances, we do not think that the § 3B1.3 enhancement should apply to a secretary who made unauthorized charges on a corporate credit card that was issued to 1,200 other employees. Ollison's fraud is the modern day equivalent of an ordinary bank teller who was pilfering money from the till. See Edwards, 325 F.3d at 1187 ("Opportunity and access

---

[10] Ollison was only authorized to buy snacks, sodas, finger foods, candy, condiments, flatware, box lunches, coffee, treats, and arrange for catering and receptions. She was not authorized to buy linen or decorate the office. This minimal level of purchasing authority cannot accurately be characterized as "substantial discretionary judgment that is ordinarily given considerable deference."

do not equate to authority, or to the kind of 'substantial discretionary judgment that is ordinarily given considerable deference.'") (citation omitted).[11]

A recent case from the D.C. Circuit explains why Ollison did not occupy a position of trust for purposes of the § 3B1.3 enhancement. In United States v. Tann, the defendant stole money from her former employers by forging checks and depositing them in her personal checking account. 532 F.3d 868, 870-71 (D.C. Cir. 2008). Tann worked as the office manager for two non-profit organizations: DCCIL and Generations. Id. At DCCIL, her duties included "hiring, ordering equipment, scheduling travel, and managing the expenditures and checks that were written." Id. at 870. (ellipsis and brackets omitted). At Generations, her duties included preparing checks, maintaining a computerized check ledger, and reconciling monthly bank statements with the ledger. Id. at 871. In concluding that Tann did not occupy a position of trust for purposes of the § 3B1.3 enhancement, the D.C. Circuit stated the following:

> Tann may have occupied a position of trust in the colloquial sense that she was trusted not to use her access for nefarious purposes; in that sense, so is every bank teller who has access to the bank's money and every janitor who cleans an office where desk drawers are left unlocked. Like the bank teller or the janitor, however, Tann did not have a job that required her to exercise professional or managerial discretion, which is the standard set forth in the application note to the Guideline. As we have said before, to apply the enhancement to a defendant merely because he or she is entrusted with valuable things and has little or no supervision while performing his or her duties would stretch the abuse-of-trust enhancement to cover endless numbers of jobs involving absolutely no professional or managerial discretion, in clear contravention of the plain language of the commentary to section 3B1.3.

Id. at 875-76 (citation omitted).

---

[11] Contrary to the position of the dissent, it is not enough that Ollison merely "had access to an opportunity not available to the general public."

Similarly, in this case, Ollison's duties as secretary were clerical in nature. Her limited authority to make official purchases with her P-Card is not the type of professional or managerial discretion contemplated by the application note to the Guidelines.  Id. at 875.  Ollison's authority to purchase inexpensive, food-related items for her office does not "involve the type of complex, situation-specific decisonmaking that is given considerable deference precisely because it cannot be dictated entirely by, or monitored against, established protocol." United States v. Tiojanco, 286 F.3d 1019, 1021 (7th Cir. 2002).   Like all employees, Ollison was trusted not to steal, but her secretary position did not give her "substantial discretionary judgment," the exercise of which permitted her to perpetrate the fraud.

b.      Significantly Facilitate

Under the Reccko two-step inquiry, our analysis should end once we conclude that Ollison did not occupy a position of trust.  In this case, we will proceed to the second step in order to fully address the arguments raised by the dissent.

Even assuming arguendo that Ollison occupied a position of trust, the Government did not provide sufficient evidence that Ollison used her secretary position in a manner that significantly facilitated the commission or concealment of the theft.[12]  In this case, the delay in detection is properly attributable to lax

---

[12] We have previously applied the § 3B1.3 enhancement when a defendant with substantial discretionary judgment has abused his or her authority in a manner that significantly facilitated the commission or concealment of the offense.  See, e.g., United States v. Dial, 542 F.3d 1059, 1060 (5th Cir. 2008) (per curiam) (insurance adjuster subject to enhancement because he used his position to settle and pay fraudulent claims up to $25,000, which enriched himself and others); United States v. Kay, 513 F.3d 432, 461 (5th Cir. 2007) (president of corporation subject to enhancement because he used his position to authorize his employees to pay bribes to foreign government officials); United States v. Wright, 496 F.3d 371, 377 (5th Cir. 2007) (mortgage broker subject to enhancement because he used his position to submit false information on loan applications to lenders with whom he had a pre-existing relationship); United States v. Burke, 431 F.3d 883, 889 (5th Cir. 2005) (city alderman subject to enhancement because he used his position to assist in the smuggling of drugs through his

oversight of the P-Card program by DISD, not concealment by Ollison. It was simply "blind luck that she was not discovered sooner." See United States v. Ragland, 72 F.3d 500, 503 (6th Cir. 1996). Although Ollison did alter some receipts before submitting them to DISD, her amateurish effort at concealment was not furthered by or related to her secretary position. The dissent correctly observes that Ollison was responsible for maintaining receipts for all purchases that she made,[13] but DISD never requested those receipts until the P-Card program was terminated in July 2006. Ollison did not evade detection through the abuse of substantial discretionary judgment that was associated with her secretary position.

---

city); United States v. Buck, 324 F.3d 786, 795 (5th Cir. 2003) (chief executive officer of nonprofit organization subject to enhancement because her position gave her "broad discretion, autonomy, and ability to conceal the falseness of her claims"); United States v. Deville, 278 F.3d 500, 508 (5th Cir. 2002) (police chief subject to the enhancement because he used his position to transport marijuana on the assumption "that his badge would enable him to transport drugs without any problems from other law enforcement officials"); United States v. Reeves, 255 F.3d 208, 213 (5th Cir. 2001) (estate planner subject to enhancement because his position "gave him unique access to clients' financial information, facilitating his fraudulent schemes"); United States v. Smith, 203 F.3d 884, 893-94 (5th Cir. 2000) (bank teller subject to enhancement because her position made her privy to the bank's internal operating and security procedures, which significantly facilitated her bank robbery); United States v. Dahlstrom, 180 F.3d 677, 685 (5th Cir. 1999) (president and CEO of corporation subject to enhancement because his position contributed to the commission and concealment of the crimes by allowing him to misallocate his company's investment funds); United States v. Powers, 168 F.3d 741, 752 (5th Cir. 1999) (gas marketer subject to enhancement because he used his position to circumvent his company's policy to sell gas only to end-users with approved credit); United States v. Iloani, 143 F.3d 921, 923 (5th Cir. 1998) (doctor subject to enhancement because he used his position to falsify medical findings, diagnoses, prescriptions, and treatment certifications that were submitted to various insurers); United States v. Harrington, 114 F.3d 517, 519 (5th Cir. 1997) (attorney subject to enhancement because his position helped him secure fraudulent affidavits and "shrouded" his actions "with a false presumption of regularity and legality"); United States v. Kay, 83 F.3d 98, 102 (5th Cir. 1996) (defendant subject to enhancement because her position gave her access to the victim's private banking records and allowed her to transfer funds between banks without detection); United States v. Scurlock, 52 F.3d 531, 541 (5th Cir. 1995) (correctional officer subject to enhancement because her position allowed her to interact with prisoners and smuggle money into the prison).

[13] Ollison did not have supervisory or auditing authority over any other DISD employee who used a P-Card.

Ollison's position as a secretary gave her the opportunity to commit the crime, but the discretionary authority associated with that position was not instrumental in accomplishing the fraud.[14] Because Ollison's legitimate spending authority was severely limited, it did not assist her in achieving her illegitimate objective. See Tiojanco, 286 F.3d at 1021; see also Ragland, 72 F.3d at 503 ("[T]here is no indication that what little autonomy defendant did possess in any way facilitated her scheme . . . ."). This case is distinguishable from United States v. Smith, where we held that a bank teller was subject to the enhancement because her position gave her "knowledge of the inner workings of the bank and its security measures[, which] significantly facilitated the commission of the offense." 203 F.3d 884, 893 (5th Cir. 2000). Ollison's secretary position did not give her insider knowledge or access to private records that facilitated the commission of the theft.[15] Ollison's misuse of her P-Card, without more, does not subject her to the § 3B1.3 enhancement. See United

[14] "To determine whether the position of trust 'significantly facilitated' the commission of the offense, the court must decide whether the defendant occupied a superior position, relative to all people in a position to commit the offense, as a result of her job." United States v. Wright, 496 F.3d 371 376 (5th Cir. 2007) (citation omitted). The proper inquiry is whether the superior position afforded an opportunity not enjoyed by the general public. United States v. Powers, 168 F.3d 741, 752 (5th Cir. 1999). In order for the enhancement to apply, the superior position must not only provide the opportunity to defraud, but also significantly facilitate its commission or concealment. See id.; see also United States v. Brown, 941 F.2d 1300, 1305 (5th Cir. 1991).

[15] In Kay, the defendant "had access to the [victims'] private banking records and, because of her accounting related skills, was able to transfer funds from bank to bank without detection." 83 F.3d at 102. Similarly, in Reeves, the defendant had "unique access to clients' financial information." 255 F.3d at 213. "Only after gaining his clients' trust by posing as an estate planner did he advise them to invest in his codefendant's company." Id. at 212. Ollison, an ordinary secretary who made unauthorized charges on her corporate credit card, cannot be analogized to Reeves, a sophisticated estate planner with insider knowledge who tricked his elderly clients into investing in sham companies, or to Kay, an accountant and bookkeeper who used fictitious bank accounts, forgeries, and insider knowledge to embezzle approximately $180,000 from her employer. In both Kay and Reeves, the defendant's position not only provided the opportunity to defraud, but also significantly facilitated its commission or concealment.

States v. Hemmingson, 157 F.3d 347, 359-60 (5th Cir. 1998) (affirming the district court's refusal to apply the enhancement to an attorney who "never performed legal services to facilitate or conceal the crime").

## III.  CONCLUSION

We affirm Ollison's conviction but vacate her sentence and remand with instructions not to apply the § 3B1.3 enhancement for abuse of a position of trust.

AFFIRMED IN PART; REVERSED IN PART; REMANDED

EMILIO M. GARZA, Circuit Judge, concurring in part and dissenting in part.

Although I concur with the majority's holdings affirming the conviction and upholding the calculation of the loss and restitution amounts, I respectfully dissent from the holding that the district court clearly erred in applying a two-level sentencing enhancement under USSG §3B1.3 for abuse of a position of trust. As we have held, a "district court's application of § 3B1.3 is a sophisticated factual determination that will be affirmed unless clearly erroneous." United States v. Ehrlich, 902 F.2d 327, 330 (5th Cir. 1990). Accordingly, we must not substitute our views for those of the district court, and must affirm if there is sufficient evidence to indicate that the defendant maintained a position of private trust and abused that position in a manner that significantly facilitated the commission of the offense. See id. Because the record indicates that there was sufficient evidence to support the district court's conclusion, I would affirm the application of the two-level enhancement.

The district court did not clearly err in finding that Ollison occupied a position of trust. As the majority notes, "[t]he primary trait that distinguishes a person in a position of trust from one who is not is the extent to which the position provides the freedom to commit a difficult-to-detect wrong." See United States v. Brown, 7 F.3d 1155, 1161 (5th Cir. 1993).[1] As a secretary to the Superintendent of the Dallas Independent School District ("DISD"), Ollison was given substantial autonomy to make purchases using her P-Card on behalf of the office. The majority is correct that DISD policies limited her authority to make

---

[1] The majority also relies on language from various other Circuits interpreting § 3B1.3 that we have not adopted. Rather than focusing (as other Circuits do) on the complexity of the employee's duties or the governability of these duties through established protocol, our cases focus on the level of power and freedom an employee has that might be abused and how this power compares to that possessed by the general public. See, e.g., Brown, 7 F.3d at 1161; United States v. Dial, 542 F.3d 1059, 1060 (5th Cir. 2008); United States v. Powers, 168 F.3d 741, 752 (5th Cir. 1999); United States v. Brown, 941 F.2d 1300, 1305 (5th Cir. 1991); Ehrlich, 902 F.2d at 331. Ollison's situation is properly analyzed according to our interpretation of § 3B1.3 rather than the jurisprudence of other Circuits.

purchases to certain office-related items, but on this record the autonomy that she had to make whatever purchases she pleased was significant. Unlike many other DISD employees, Ollison was issued a P-card that enabled significant and supervision-free spending. Further, Ollison was charged with the authority to review and reconcile her own bank statements from the P-card, indicating that she was trusted to self-police her own purchases. That DISD policies limited her authorized purchases to arguably minor items does not change the fact that the P-card itself and the limited oversight of her spending decisions allowed her to exercise substantial discretionary judgment. Overall, Ollison was entrusted with the freedom to exercise judgment when using the P-card, and her wrongful actions proved difficult to detect because of this freedom. See id.

Moreover, the district court did not clearly err in concluding that Ollison used her position of trust to significantly facilitate the commission or concealment of the offense. She abused the fact that she was afforded very little oversight in using the P-card, which allowed her to make unauthorized purchases in the amount of $64,633. As stated in the Presentence Report, Ollison was able to evade detection because she was responsible for maintaining receipts for all purchases and for reviewing and reconciling the bank statements after the P-Card purchases were made.[2] Regardless of the majority's assertions that Ollison could have been detected sooner and that her efforts at concealment were "amateurish," the fact remains that her self-policing duties and freedom from oversight facilitated her ability to purchase the personal items without detection. Again, there is sufficient evidence to support the district court's conclusion that Ollison's position significantly facilitated her crime, and we must not substitute our own interpretation of the facts for that of the district court.

---

[2] A crime resulting from lax supervision will not always support the application of the §3B1.3 enhancement; however, in this case the record supports the finding that Ollison maintained enough freedom from supervision to facilitate the commission of the offense.

Ollison's discretion in using her P-Card also distinguishes her from the situations explicitly excluded by § 3B1.3.  The Commentary to § 3B1.3 clarifies the definition of "public or private trust":

> This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

Unlike the ordinary bank teller or hotel clerk, Ollison was entrusted with the responsibility of using her P-Card to make necessary purchases))a responsibility that was not given to every employee of the DISD.  The bank teller in the above example and the office manager in United States v. Tann cited by the majority were not given the authority to take money or forge checks in some situations but not others.  See 532 F.3d 868, 870-71.  Although in these cases the offenders had the capability and the access necessary to commit theft, the reason that they were not in a position of trust is that they did not have the freedom to exercise any judgment as to when the action constituted theft and when it did not.  Here, Ollison could exercise judgment as to whether or not a purchase was necessary for the Superintendent.  She had the freedom to make the purchase without supervision, and the purchase was only illegal if it was not for the Superintendent and she failed to reimburse the money.  In the above examples, the bank teller pocketing money and the office employee forging checks was illegal in all circumstances regardless of the individual's judgment.

Ollison's situation is unique compared to other examples from the Sentencing Guidelines and our case law.  As the majority notes, the proper inquiry under § 3B1.3 is whether the defendant's position affords him or her an opportunity not enjoyed by the general public.  United States v. Powers, 168 F.3d

28

741, 752 (5th Cir. 1999). As a P-Card holder who was able to charge to the government tens of thousands of dollars in purchases, both authorized and unauthorized, Ollison quite clearly had access to an opportunity not available to the general public. Further, she was entrusted by the Superintendent, DISD, and the United States government to use her judgment regarding what purchases were necessary for the Superintendent's office and she was afforded wide latitude to spend large amounts of money ostensibly to those ends.

In conclusion, under the deferential review we apply to the "sophisticated factual determination" made below I do not find that the district court clearly erred in enhancing Ollison's sentence for abuse of a position of trust. Although a de novo review might reach a different conclusion, the district court's judgment is not unsupported by the record. Accordingly, I concur in the first parts of the opinion, but dissent from Part II(F)(2).