# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-50079

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

MARCO ANTONIO DELGADO,

Defendant - Appellant

United States Court of Appeals<br>
Fifth Circuit<br>
**FILED**<br>
May 1, 2015<br>
Lyle W. Cayce<br>
Clerk

Appeal from the United States District Court
for the Western District of Texas
USDC No. 3:12-CR-2106-1

Before JOLLY and DENNIS, Circuit Judges, and REEVES, District Judge.*

PER CURIAM:**

This appeal arises out of the sentencing of defendant Marco Antonio Delgado for a conviction on one count of conspiracy to commit money laundering. He argues that he should not have received several sentencing enhancements. For the reasons stated below, we VACATE in part and REMAND.

---

* District Judge of the Southern District of Mississippi, sitting by designation.

** Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

No. 14-50079

## I. Background

In 2007, agents with United States Immigration and Customs Enforcement (ICE) began investigating Delgado because of financial transactions in El Paso, Texas; Chicago, Illinois; and Atlanta, Georgia, which were believed to have involved proceeds of Mexican drug trafficking organizations. In September 2007, Georgia law enforcement officials conducted a traffic stop on a vehicle driven by Delgado's associate, Victor Ignacio Pimentel. After receiving Pimentel's consent, officials searched his vehicle and found approximately $1 million. That $1 million, Pimentel testified, was a trial run amount to test their ability to launder large sums of money.

Following his detainment, Pimentel volunteered information to ICE agents pertaining to his partnership with Delgado, their criminal affiliation with Francisco Fernandez and Pedro-Mendoza-Meneses, and the group's plans to illegally transfer currency. He further informed agents that Delgado, who communicated with Pimentel from the email of his law firm, "Delgado and Associates," provided him with fraudulent court documents indicating that the currency derived from a court settlement. Delgado had instructed Pimentel to show law enforcement officials these documents in the event he was stopped.

Subsequently, ICE agents conducted a controlled delivery of the currency to Delgado in El Paso. Officials stopped Pimentel and Delgado during the delivery, and a search of their vehicle revealed the currency. Delgado waived his constitutional rights and cooperated with the agents. He informed them that the scheme involved Lillian De La Concha, the former wife of Mexican President Vincente Fox, and that he met Fernandez and Mendoza-Meneses through De La Concha in the 2006-2007 time frame. In May 2007, Delgado, De La Concha, Fernandez, and Mendoza-Meneses

2

discussed an operation which involved transferring $600 million from the United States to Mexico. Delgado further explained that he was subsequently introduced to Isidro Rubio-Vega, who was involved in the transfer of the currency with which Pimentel was apprehended in Georgia.

Delgado agreed to assist in a second controlled delivery of money, this time to Mendoza-Meneses and Rubio-Vega in El Paso. Arrangements for the transfer of currency were made and, with the assistance of an undercover agent, the currency was again seized and law enforcement obtained information on yet another participant, Chuy (last name unknown). The undercover agent learned more about the operations, including that the laundering conspiracy involved seven people: Delgado, Pimentel, Chuy, Fernandez, De La Concha, Mendoza-Meneses, and Rubio-Vega.

Pimentel also provided law enforcement agents with emails between Delgado and De La Concha. The emails, which spanned from June 2006 to August 2007, contained discussions about the group's money laundering scheme. In an August 16, 2006 email, for example, De La Concha informed Delgado that the "Girl Scouts" wanted him to help them place more than five boxes of cookies per school each week, because they had in the warehouse 500 boxes instead of 300, a figure that would increase because of the donations they would be receiving. "Girl Scouts" was a code word used by the cartel: the e-mail meant that members of the organization wanted Delgado to launder $5 million per week, and they had $500 million ready to be laundered. As another example, in a March 4, 2007 email, De La Concha discussed "100 houses," translated as $100 million, for another client.

In July 2008, Pimentel informed ICE agents that Delgado was seeking to transport $100,000 in illegal drug proceeds from Chicago to El Paso. Pimentel was to transfer this amount as a trial run for the cartel, to determine if he and Delgado would eventually be able to transport $10

million to Mexico. ICE agents in Chicago were notified of the pending money pick up and, from that point, the illegal activities proceeded under the agents' observation and control. After various amateurish missteps,[1] under Delgado's direction, $45,000 was eventually deposited into the Delgado and Associates bank account.

Delgado was indicted for Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h). At trial, a jury found him guilty as charged.

At Delgado's sentencing hearing, the district court adopted the factual findings of the Presentencing Report (PSR). Although he was to challenge the sentencing enhancements recommended by the PSR, Delgado did not challenge the factual information in the PSR either via written objections or at the sentencing hearing. The PSR established that his base offense level was 38, due to a money laundering offense involving more than $400 million. Six levels were added pursuant to U.S.S.G. § 2S1.1(b)(1) based on a finding that Delgado knew or believed that some of the laundered funds were the proceeds of, or were intended to promote, an offense involving the manufacture, importation, or distribution of a controlled substance or a listed chemical. Four levels were added pursuant to U.S.S.G. § 2S1.1(b)(2)(C) based on a determination that Delgado was in the business of laundering funds. Two more levels were added pursuant to U.S.S.G. § 3B1.3 based on a finding that he abused a position of public or private trust, or used a special skill, in

---

[1] Delgado planned for Pimentel to receive the $100,000 in two $50,000 installments, which Pimentel was supposed to deposit into a Wells Fargo account provided by Delgado. After receiving the first half, Pimentel had to drive to Wisconsin because there were no Wells Fargo branches in Chicago. His drive proved futile because the bank account number was under the name of Delgado's girlfriend and personnel at the bank were not able to communicate with her to confirm the transaction. Upon being informed of the complications, Delgado instructed Pimentel to deposit the money with the bank in exchange for cashier's checks, but this method also failed because Pimentel did not have a bank account with Wells Fargo. Ultimately, Delgado texted Pimentel the Delgado and Associates Wells Fargo bank account number to complete the transaction.

a manner that significantly facilitated the commission or concealment of the offense. Another four levels were added pursuant to U.S.S.G. § 3B1.1(a) based on a finding of Delgado's aggravated role. Two levels were then added pursuant to U.S.S.G. § 3C1.1 for obstruction of justice, based on the belief that Delgado provided a fraudulent email during trial. His resulting offense level was 56. It was reduced to 43 pursuant to U.S.S.G. Chapter Five, Part A.

Delgado objected to the base offense level and to all sentencing enhancements recommended by the PSR. The district court overruled all except Delgado's objection to the obstruction of justice enhancement. It found that, based upon a total offense level of 43 and a criminal history category of I, Delgado's guideline imprisonment range was life. However, because the statutorily authorized maximum sentence of 240 months was less than life imprisonment, it became the guideline sentence. Delgado was sentenced to 240 months, followed by three years supervised release, a $25,000 fine, and a $100 special assessment. This appeal followed.

## II. Standard of Review

"We review a district court's interpretation or application of the Sentencing Guidelines *de novo*, but review its factual findings for clear error." *United States v. Alexander*, 602 F.3d 639, 641 (5th Cir. 2010) (citation omitted). "A factual finding on a sentencing factor is not clearly erroneous so 'long as it is plausible in light of the record read as a whole.'" *United States v. Alaniz*, 726 F.3d 586, 622 (5th Cir. 2013) (quoting *United States v. Morris*, 46 F.3d 410, 419 (5th Cir. 1995)). When significant procedural error occurs at sentencing, remand is required unless the error was harmless. *See United States v. Delgado-Martinez*, 564 F.3d 750, 752-53 (5th Cir. 2009). Harmless error applies if the government establishes that "the district court would have imposed the same sentence had it not made the error, and . . . that it

would have done so for the same reasons it gave at the prior sentencing." *United States v. Ibarra-Luna*, 628 F.3d 712, 714 (5th Cir. 2010).

### III. Discussion

Delgado now raises four challenges to the district court's sentencing enhancements. We address each in turn.

### A. Thirty-level Enhancement Under § 2S1.1

U.S.S.G. § 2S1.1 imposes a base offense level of eight for money laundering, and instructs that the level increases as the amount of loss increases. *See* §§ 2S1.1(a)(2), 2B1.1 (providing level increases for loss amounts deemed to exceed $5,000). The district court found that Delgado intended to launder up to $600 million. Consequently, it imposed the 30-level increase afforded to persons who launder more than $400 million, thereby creating the base offense level of 38. Delgado argues that the district court's finding that over $400 million was involved in the money laundering conspiracy was clearly erroneous, as there is no evidence that he was *reasonably capable* of laundering $600 million, more than a half billion dollars. In response, the Government's argument focuses on *intent*. It avers that Delgado conspired to launder more than $400 million.

"When calculating funds for sentencing purposes, it is permissible to consider the entire amount the parties *intended* to launder." *United States v. Leahy*, 82 F.3d 624, 638 (5th Cir. 1996) (citing *United States v. Tansley*, 986 F.2d 880, 884 (5th Cir. 1993)). District courts "*may also* use the broader amount that defendants could have been 'reasonably capable' of laundering." *Tansley*, 986 F.2d at 884 (citing *United States v. Fuller*, 974 F.2d 1474, 1484 (5th Cir. 1992)) (emphasis added). Thus, our precedent provides two options for determining the amount of laundered funds.

Neither option is squarely presented in this case. To understand why, we begin with a discussion of two seminal cases on money laundering

enhancements under § 2S1.1, *United States v. Tansley* and *United States v. Richardson*, 925 F.2d 112 (5th Cir. 1991).

The *Tansley* defendants were convicted of various crimes stemming from a telemarketing scheme. *Tansley*, 986 F.2d at 883. They made deposits at various banks in an effort to launder funds from credit card purchases. *Id.* at 884. The defendants only withdrew a fraction of the money they had deposited before the accounts were frozen, and they argued that the amount of loss should be based solely on what they took out. *Id.* In upholding the money laundering sentencing enhancements, this court reasoned that "the larger amount that was processed through the various factors and then deposited in various banks were [sic] put in the laundering process and the fact that all the money was not withdrawn is irrelevant." *Id.* at 884. *Tansley* concluded that intent to launder the entire amount was sufficient for sentencing purposes and that funds under negotiation are properly considered to calculate a sentence. *Id.*

Similarly, the *Richardson* court found intent to launder where the defendant "had not yet touched the money," due to evidence that "a co-conspirator . . . had accompanied [the defendant] to the meeting, had fully counted the money, placed it in the valise, closed the valise, and placed it near [the defendant]." *Richardson*, 925 F.2d at 116. Thus, in *Tansley* and *Richardson*, this court found that the defendants were liable for the entire amounts they intended to launder. In those cases, however, the values of laundered funds were actual funds which were measured in financial transactions or in accounts. Delgado's case, in contrast, is not based on measurable funds. Delgado merely floated the *prospect* of laundering $600 million; his ability to actually launder the funds was contingent upon first successfully securing the Mexican cartel's business.

In this situation, we have sought guidance from this court's previous explanation that "the same policy considerations" govern the "analogous situation involving the distribution of controlled substances, in which the question arises whether the weight under negotiation in an uncompleted distribution should be used to calculate the applicable amount for sentencing purposes." *Id.* at 116 n.12. Those policy considerations, found in the commentary to § 2D1.1, provide as follows:

> If, however, the defendant establishes that the defendant did not intend to provide or purchase, *or was not reasonably capable of providing or purchasing, the agreed-upon quantity of the controlled substance*, the court shall exclude from the offense level determination the amount of controlled substance that the defendant establishes that the defendant did not intend to provide or purchase or was not reasonably capable of providing or purchasing.

U.S.S.G. § 2D1.1, cmt. n.5 (emphasis added).

Here, the record is replete with evidence indicating that Delgado's capability to launder more than $400 million was still inchoate. The only tangible funds he was given, for "trial runs," totaled $1,050,000, which represents a mere 0.175% of the $600,000,000 the district court attributed to him. Moreover, the email conversations from which the Government derived its enhancement calculation simply evince discussions of large amounts of currency that could *possibly* be laundered. They are insufficient to displace all of the evidence suggesting the implausibility that the amount could ever materialize, including: Delgado's unsuccessful "test runs" demonstrating that he had no capability to launder large sums of money; Pimentel's testimony clarifying that he and Delgado were among other competitors bidding for business agreements with the cartel; and an email to Delgado from De La Concha explaining that "one of the reasons nothing has happened is because [the cartel] went to your competition because you were too expensive (at 10%

per total laundered amount)." Given the evidence, Delgado should not have been accountable for $600 million in enhancements.[2] On remand, the district court must recalculate the enhancement based on the sum Delgado was reasonably capable of laundering.

## B. Four-level Enhancement Under § 2S1.1(b)(2)(C)

Under § 2S1.1(b)(2)(C), if a defendant is found to be in the business of laundering funds, his offense level is increased by four levels. Delgado argues that the evidence fails to establish that he was in the business of laundering funds. We agree.

The commentary to § 2S1.1 instructs that courts shall consider the totality of the circumstances when determining whether a defendant was in the business of laundering funds. U.S.S.G. § 2S1.1, cmt. n.4(A).[3] The

---

[2] Evidence of the unskilled manner in which they attempted to execute the transaction illustrates that these defendants were not equipped to accomplish an operation of this scale. Pimentel drove his vehicle with a Mexican license plate on Interstate 20 carrying $1 million, which he testified was in two "huge bags full of money, really heavy, and . . . in $1s, $5s, and $20s." Our cases are legion concerning targeted drug corridors and identifiers that law enforcement authorities hone in on to make traffic stops. *See, e.g.*, *United States v. Jenson*, 462 F.3d 399, 405-06 (5th Cir. 2006) (noting that among the factors the Court has considered in finding a search reasonable is that the defendant was traveling on I-20, a known drug corridor) (citing *United States v. Reyes Gonzalez*, 328 F.3d 755, 758 (5th Cir. 2003)); *United States v. Irick*, 315 F. App'x 111, 113 (11th Cir. 2008) (finding that reasonable suspicion existed given the arresting officer's "knowledge about drug trafficking, [the defendant's] lack of luggage in the light of his explanation that he had been in Atlanta for the weekend, his nervousness, and that I-20 is a known drug corridor") (citation omitted). On the issue of an initial traffic stop's legality, the district court in *United States v. Lopez* found that the arresting officer's suspicions, which were based on his belief that I-20 is a frequent channel of illegal narcotics, were reasonable. 817 F. Supp. 2d 918, 920 n.6 (S.D. Miss. 2011) (The arresting officer provided testimony that in his experience, drug traffickers on I-20 use the eastbound lanes and transport money – presumably the proceeds from successful drug transactions – in the westbound lanes.); *see also United States v. Mendez*, 181 F. App'x 754, 758 (10th Cir. 2006) (holding that the presence of a foreign license plate would more strongly support a finding of reasonable suspicion).

[3] Section B to the commentary provides courts with the following non-exhaustive list of factors that may indicate that a defendant was in the business of laundering funds:
    (i) The defendant regularly engaged in laundering funds.
    (ii) The defendant engaged in laundering funds during an extended period of time.

Government's argument that this adjustment was warranted is based on incidents that, when viewed in their totality, demonstrate efforts made by Delgado in his *attempt* to be in the business of laundering funds. To support this enhancement, the PSR details, among other things, Delgado's participation in various meetings over several years which involved sales pitches to De La Concha and introductions to supposed drug lords. Also documented are trips to the Turks and Caicos Islands to set up a dummy corporation through which Delgado would launder money, and the large sums of money deposited into his girlfriend's bank account. The glaring omission from the PSR, however, is any occurrence of successful money laundering by Delgado.

This court has upheld a district court's finding that a defendant was in the business of laundering funds where he "regularly laundered money from numerous customers over the course of two years, and . . . made a substantial amount of money doing so." *United States v. Arledge*, 524 F. App'x 83, 88 (5th Cir. 2013) (unpublished). Whether the defendant "regularly engaged in laundering funds" is one of the non-exhaustive factors that the district court

---

(iii) The defendant engaged in laundering funds from multiple sources.

(iv) The defendant generated a substantial amount of revenue in return for laundering funds.

(v) At the time the defendant committed the instant offense, the defendant had one or more prior convictions for an offense under 18 U.S.C. § 1956 or § 1957, or under 31 U.S.C. § 5313, § 5314, §  5316, § 5324 or § 5326, or any similar offense under state law, or an attempt or conspiracy to commit any such federal or state offense. A conviction taken into account under subsection (b)(2)(C) is not excluded from consideration of whether that conviction receives criminal history points pursuant to Chapter Four, Part A (Criminal History).

(vi) During the course of an undercover government investigation, the defendant made statements that the defendant engaged in any of the conduct described in subdivisions (i) through (iv).

U.S.S.G. § 2S1.1, cmt. n.4(B).

may consider to determine whether the defendant is in the business of laundering funds. U.S.S.G. § 2S1.1, cmt. n.4(B)(i)-(vi).

In this case, Delgado did not regularly engage in laundering funds. Nor do the other factors support this enhancement: the evidence, for example, does not show that the alleged laundering was from "multiple sources" or that Delgado actually obtained "substantial revenue" from his efforts to launder. *See id*. In fact, at trial Pimentel testified that after a year of holding meetings with discussions of large sums of money and "promises of . . . being rich and powerful people . . . nothing had actually happened." Delgado regularly *presented himself* as an individual in the business of laundering funds. But there is insufficient proof that Delgado was in fact in the "business" of laundering funds.

## C. Two-level Enhancement Under § 3B1.3

The district court assessed a two-level enhancement pursuant to § 3B1.3, which provides an increase for "abuse of position of trust or use of special skill." U.S.S.G. § 3B1.3. It erred by imposing this enhancement without performing the requisite two-step inquiry in *United States v. Ollison*, 555 F.3d 152 (5th Cir. 2009).

The district court's § 3B1.3 ruling suggests that Delgado's status as an attorney alone placed him in a position of trust which automatically assisted him significantly with laundering money. The PSR and the Addendum to the PSR, which the trial court adopted, state how Delgado drafted fraudulent court documents for Pimentel to present if stopped by law enforcement, and used the "Delgado and Associates" bank account to deposit funds used in a sting operation. The PSR notes the adjustment is warranted "for Abuse of Position of Trust or Use of a Special Skill," but it fails to specify under which basis the two-level enhancement should be applied.

11

No. 14-50079

"The application of § 3B1.3 is a sophisticated factual determination reviewed under the clearly erroneous standard." *United States v. Fisher*, 7 F.3d 69, 70 (5th Cir. 1993) (citation omitted).

The district court found that the initial *Ollison* inquiry, whether Delgado "occupied a position of trust," produced an affirmative answer. *Ollison*, 555 F.3d at 165 (citing *United States v. Kay*, 513 F.3d 432, 459 (5th Cir. 2007)). The analysis should not have ended there. In *Ollison*, this court held that, following a determination that the defendant held a position of trust, "the court *must* proceed to ascertain the extent to which the defendant used that position to facilitate or conceal the offense." *Id.* (citing *United States v. Reccko*, 151 F.3d 29, 31 (1st Cir. 1998) (emphasis added)); *see* § 3B1.3, cmt. n.1 (providing an example that the adjustment "applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian").

In this case, the first prong in *Ollison* is met because attorneys inherently occupy a position of public trust. *See United States v. Harrington*, 114 F.3d 517, 519 (5th Cir. 1997). There also is record evidence supporting the point that, to some extent, Delgado used his position as an attorney to attempt to facilitate the commission or concealment of money laundering, as he prepared fraudulent court documents, used his client trust account, and used his law firm's email account in connection with the offense.

Even though Delgado held a position of trust, the next question to be answered is whether his profession "significantly facilitate[d] the commission or concealment of the offense." *Ollison*, 555 F.3d at 165. The "significant facilitation" standard asks the court to consider "whether the defendant occupied a superior position, relative to all people in a position to commit the offense, as a result of her job." *United States v. Pruett*, 681 F.3d 232, 248 (5th Cir. 2012) (quoting *Kay*, 513 F.3d at 459 (quotation marks omitted)). In

*Ollison*, this court referenced a number of cases showing circumstances where a defendant's position of trust significantly facilitated the offense, thereby warranting § 3B1.3 enhancements. *Ollison*, 555 F.3d at 168 n.12 (citing, *inter alia*, *Harrington*, 114 F.3d at 519 (attorney subject to enhancement because his position helped him secure fraudulent affidavits and "shrouded" his actions "with a false presumption of regularity and legality"); *United States v. Dial,* 542 F.3d 1059, 1060 (5th Cir. 2008) (insurance adjuster subject to enhancement because he used his position to settle and pay fraudulent claims up to $25,000); *United States v. Scurlock,* 52 F.3d 531, 541 (5th Cir. 1995) (correctional officer subject to enhancement because her position allowed her to interact with prisoners and smuggle money into the prison)).

Without a finding that Delgado used his position of trust to "significantly facilitate the commission or concealment" of money laundering, the § 3B1.3 enhancement cannot be imposed. *Ollison*, 555 F.3d at 165. On remand, the district court must consider the second step of the *Ollison* inquiry.

## D. Four-level Enhancement Under § 3B1.1

The district court applied a four-level enhancement to Delgado's sentence pursuant to § 3B1.1, based on his role as an organizer or leader of a criminal activity. *See* § 3B1.1(a) (providing for an increase in the base offense level where "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive"). The language in § 3B1.3, however, provides that an enhancement under § 3B1.1 may not be imposed if the court also imposes a § 3B1.3 enhancement based solely on the defendant's use of a special skill. Specifically, § 3B1.3 provides:

> If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under

(Aggravating Role); *if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1* (Aggravating Role).

U.S.S.G. § 3B1.3 (emphasis added).

As discussed above, the PSR and the Addendum to the PSR are ambiguous regarding the basis for the § 3B1.3 adjustment. In overruling Delgado's objection to the enhancement under § 3B1.3, however, the district court stated that the enhancement was a two-level upward adjustment for abuse of a position of trust. Although no reasoning behind that enhancement was provided, it was read conjunctively with the "four levels for aggravated role." Therefore, we are satisfied that the court determined the enhancement appropriate on a finding of abuse of a position of trust, which, as previously discussed, was unwarranted. Given the evidence in this case, the four-level enhancement under § 3B1.1 is likely appropriate;[4] however, the enhancement cannot be applied without first determining the proper application of the enhancement under § 3B1.3.

## IV. Conclusion

For the foregoing reasons, we vacate Delgado's sentence and remand this case for resentencing.

VACATED and REMANDED.

---

[4] Commentary to § 3B1.1 provides that "[t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of *one or more* other participants." § 3B1.1, cmt. n.2 (emphasis added). There is ample evidence that Delgado exercised control and authority over Pimentel during the commission of an offense. He orchestrated the money laundering transactions in both Atlanta and Chicago, and directed Pimentel's actions in each. Pimentel also testified that Delgado planned Pimentel's trips to Turks and Caicos and instructed him about the individual with whom he should meet to create dummy corporations for laundering funds.