# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-10594

United States Court of Appeals
Fifth Circuit

**FILED**

October 18, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

DANA KAY MILLER,

      Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before STEWART, Chief Judge, and JONES and ENGELHARDT, Circuit Judges.

KURT D. ENGELHARDT, Circuit Judge:

Dana Kay Miller pled guilty without a plea agreement to bank fraud, in violation of 18 U.S.C. § 1344(2), and was sentenced above the advisory guidelines range to 96 months of imprisonment and five years of supervised release. On appeal, Miller argues that the district court clearly erred by applying a two-level enhancement under U.S.S.G. § 3B1.3 for abusing a position of trust and by applying a two-level enhancement under U.S.S.G. § 2B1.1(b)(10)(C) for using sophisticated means. We AFFIRM Miller's sentence.

No. 17-10594

## FACTS AND PROCEEDINGS

In August 2014, Miller began working as the accounts payable clerk for Hawk Steel Industries, Inc. (HSI), a scrap metal processing and recycling company owned and operated by Peter and Susan Bausone. Miller was primarily responsible for preparing the payroll for the approximately 80 HSI employees and preparing the weekly vendor payment checks. Each week, HSI disbursed 80–100 checks to pay metal suppliers and other vendors. Miller used the company's accounting software to make bookkeeping entries and to prepare and print weekly checks that were to be submitted to HSI's office manager for signature. After the checks were signed, Miller transmitted an electronic copy of the authorized checks directly to HSI's bank, Regions Bank, so that the checks would be paid when presented and to ensure that only the checks written by HSI were paid.

Miller began writing fraudulent HSI checks to her boyfriend, Russell Sandifer, in October 2014, and continued to write two to three fraudulent checks to Sandifer per week, forging the office manager's signature.[1] Miller included the fraudulent checks with legitimate checks she recorded in HSI's accounting system, falsely representing in the company's accounting records that Sandifer sold metal to HSI. She also included the fraudulent checks in the list of authorized checks that she transmitted to Regions Bank.

As part of Miller's fraudulent scheme, Miller and Sandifer opened a joint checking account at Woodforest National Bank (WNB) in October 2014. Between October 2014 until February 2016, Miller deposited 228 fraudulent HSI checks payable to Sandifer, totaling about $1,536,000, into Miller and Sandifer's WNB account. In February 2016, WNB became suspicious of the

---

[1] The office manager, Jim Milligan, and co-owner, Susan Bausone, were the only authorized signors on the HSI checking account at Regions Bank.

frequent deposits made to the WNB after-hours drop box; thus, the bank required HSI's verification of the deposits. Miller composed a letter attempting to provide the requested verification, but it was refused by WNB because it was not notarized. Consequently, Miller had Sandifer close the WNB account. That same month, Miller and Sandifer opened another joint checking and savings account at Texas Trust Credit Union (TTCU) and began depositing fraudulent HSI checks into that account. Between February and July 2016, Miller deposited 72 fraudulent HSI checks into the TTCU account, totaling approximately $729,000.

Concerned that something was amiss with the company's finances, Susan Bausone conducted an audit of HSI's checks in July 2016.[2] The audit revealed checks written to Sandifer between October 2014 and July 2016 that appeared to be forged. Because of Miller's inability to explain the payments to Sandifer—identified for the first time as her boyfriend—and due to the lack of documentation to support any sales transaction between Sandifer and HSI, Miller was terminated from HSI. In total, Miller wrote 300 fraudulent checks, stealing $2,239,407.68 from HSI.[3] Miller spent the stolen money on a plethora of personal expenditures, including a down payment on a home, a swimming pool, numerous cars and motorcycles, an engagement ring, and various cosmetic surgeries and procedures.

Miller pled guilty without a plea agreement to a one-count information, charging her with bank fraud, in violation of 18 U.S.C. § 1344(2). Based on the

---

[2] Peter Bausone, co-owner of HSI, testified at Miller's sentencing hearing that the company began experiencing noticeable, incomprehensible financial trouble in December 2015, resulting in the cessation of annual employee bonuses for the first time in 37 years; denial of overtime; and loss of key employees. Despite its inexplicable financial concerns, HSI did not grow suspicious of Miller until July 2016 when one of the owners began noticing Miller's extravagant spending.

[3] Regions Bank paid all but two of the fraudulent checks when presented and drew funds from HSI's account. The two checks not paid by Regions Bank totaled $26,665.01.

No. 17-10594

United States Sentencing Guidelines, as calculated in the presentence report (PSR), Miller's base offense level was seven, subject to a 16-level increase based on the amount of loss; a two-level increase under the sophisticated means enhancement; and another two-point increase for Miller's abuse of a position of trust. Applying these enhancements, Miller's adjusted offense level was 27, which was reduced by three points for her acceptance of responsibility, resulting in a total offense level of 24. Miller's total offense level of 24 and criminal history category of I yielded a guidelines imprisonment range of 51 to 63 months.

Relevant to this appeal, Miller filed written objections to the abuse of trust and sophisticated means enhancements. At sentencing, after considering further argument by Miller's counsel, the district court overruled Miller's objections and adopted the PSR and addenda as its findings of fact. Miller received an above-guidelines sentence of 96 months imprisonment. Miller timely appealed her sentence. On appeal, Miller argues that the district court clearly erred by applying a two-level enhancement under U.S.S.G. § 3B1.3 for abusing a position of trust and by applying a two-level enhancement under U.S.S.G. § 2B1.1(b)(10)(C) for using sophisticated means.[4]

## STANDARD OF REVIEW

"We review the district court's interpretation and application of the Guidelines de novo and its factual findings for clear error." *United States v. Hernandez*, 876 F.3d 161, 164 (5th Cir. 2017) (citing *United States v. Trujillo*, 502 F.3d 353, 356 (5th Cir. 2007)). Accordingly, we review for clear error the district court's factual determinations that Miller abused a position of trust and used sophisticated means. *See United States v. Ollison*, 555 F.3d 152, 164

---

[4] As conceded at oral argument, Miller does not appeal the 33-month upward variance. Thus, this argument is waived. *See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("An appellant abandons all issues not raised and argued in its initial brief on appeal.").

(5th Cir. 2009); *United States v. Conner*, 537 F.3d 480, 492 (5th Cir. 2008). "Under the clearly erroneous standard, we will uphold a finding so long as it is plausible in light of the record as a whole." *United States v. Miller*, 607 F.3d 144, 148 (5th Cir. 2010) (quoting *United States v. Ekanem*, 555 F.3d 172, 175 (5th Cir. 2009)).

## DISCUSSION

Miller appeals the district court's application of the abuse of a position of trust sentencing enhancement and the sophisticated means sentencing enhancement. We address her arguments in turn.

I. *Abuse of a Position of Trust*

Miller first challenges the district court's imposition of the enhancement for abuse of a position of trust, pursuant to U.S.S.G. § 3B1.3. Miller's argument largely rests on her contention that she did not occupy a position of trust, attempting to analogize *Ollison*; *United States v. Vinalay*, 694 F. App'x 278 (5th Cir. 2017); and a case from a different circuit, *United States v. Tann*, 532 F.3d 868 (D.C. Cir. 2008). Miller argues that, as an accounts payable clerk, she held a clerical position with little-to-no discretion, had limited duties, and did not have any managerial or professional discretion. Miller further argues that stealing from a trusting employer while under minimal supervision does not warrant a position of trust enhancement. Miller asserts that any accounts payable clerk could have committed the theft and that her position did not help her commit or conceal the theft.

Section 3B1.3 of the Sentencing Guidelines provides for a two-level increase to the defendant's offense level "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense . . . ." U.S.S.G. § 3B1.3. Applying a two-step inquiry, the sentencing court must first "determine whether the defendant occupied a position of trust at all." *Ollison*, 555 F.3d at

165. "A position of trust is characterized by (1) professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference), and (2) minimal supervision." *Id.* at 166 (citing U.S.S.G. 3B1.3 cmt. n.1). Persons holding a position of trust "ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." U.S.S.G. § 3B1.3 cmt. n.1. This enhancement "does not apply in the case of an embezzlement or theft by an ordinary teller or hotel clerk because such positions are not characterized by [these] factors." *Id.* We consider "the extent to which the position provides the freedom to commit a difficult-to-detect wrong" to be a "primary trait" in determining whether a person is in a position of trust. *United States v. Brown*, 7 F.3d 1155, 1161 (5th Cir. 1993).[5] If the court finds that the defendant did not occupy a position of trust, "the inquiry ends and no enhancement accrues." *Ollison*, 555 F.3d at 165.

If the defendant occupied a position of trust, then the court must "ascertain the extent to which the defendant used that position to facilitate or conceal the offense." *Id.* (quoting *United States v. Reccko*, 151 F.3d 29, 31 (1st Cir. 1998)). "In order for the enhancement to apply, the [defendant's] superior position must not only provide the opportunity to defraud, but also significantly facilitate its commission or concealment." *Id.* at 169 n.14. To determine whether a position of trust "significantly facilitated" the commission or concealment of the offense, the court must decide "whether the defendant

---

[5] In her Rule 28(j) letter, Miller cites the Third Circuit's decision in *United States v. Douglas*, 885 F.3d 124 (3d Cir. 2018), arguing that our decision in *United States v. Brown* was abrogated by the 1993 amendment (Amendment 492) to Section 3B1.3, which added language referring to professional or managerial discretion. We disagree. Whether a position provides the freedom to commit a difficult-to-detect wrong remains a primary trait—although not dispositive—in distinguishing a person in a position of trust from one who is not. *See, e.g., Ollison*, 555 F.3d at 166 (citing *Brown* post-Amendment 492 when characterizing a position of trust as including professional or managerial discretion and minimal supervision).

occupied a superior position, relative to all people in a position to commit the offense, as a result of her job." *United States v. Kay,* 513 F.3d 432, 459 (5th Cir. 2007) (citation omitted).

Given our deferential review, Miller has not demonstrated clear error. The district court's findings that Miller occupied a position of trust and that she used that position to significantly facilitate the commission and the concealment of her fraudulent scheme are plausible in light of the record as a whole. Each week, Miller used the company's accounting software to prepare and print approximately 80–100 checks to pay HSI's vendors. As HSI's accounts payable clerk, Miller had the discretion to create new vendor entries in her employer's bookkeeping system, which she utilized to add her boyfriend as a payee, and to issue checks to pay those vendors.[6] Further, Miller exercised professional discretion when she presented a list of HSI checks directly to Regions Bank for electronic verification and authorization of payment. Miller included the fraudulent checks with the legitimate checks, deceiving Regions Bank into believing the fraudulent checks were legitimate so that it would make payment on the fraudulent checks when presented.

Moreover, as conceded by Miller's counsel at oral argument, Miller was not a closely supervised employee. Miller's disbursement of funds and maintenance of accounting logs was essentially unsupervised, as demonstrated by the number of times Miller forged checks for payment (300 checks), the amount she stole from HSI ($2,239,407.68), as well as the length of time she maintained the fraudulent scheme undetected (21 months).

---

[6] There is no mention in the record that any of the other approximately 80 employees enjoyed similar access or authority. *Cf. Ollison*, 555 F.3d at 166 ("Absent proof of other aggravating circumstances, we do not think that the § 3B1.3 enhancement should apply to a secretary who made unauthorized charges on a corporate credit card that was issued to 1,200 other employees.").

No. 17-10594

Miller's deferential position afforded her the autonomy to add and pay vendors, and her fraudulent conduct proved difficult to detect because of this freedom and limited supervision. *See Brown*, 7 F.3d at 1161; *see also Ollison*, 555 F.3d at 170 (Garza, J., dissenting). Miller's discretionary judgment, her largely unsupervised access to the company's accounting records, and her exploitation of her knowledge of HSI's internal accounting procedures, renders her case distinguishable from the cases she attempts to analogize, and more comparable to cases where we have upheld the abuse of trust enhancement. *See, e.g., United States v. Smith*, 203 F.3d 884, 893–94 (5th Cir. 2000) (holding that a part-time teller occupied a position of trust because of special knowledge of operating and security procedures, which the teller used to facilitate a robbery); *United States v. Roberts*, 75 F. App'x 266, 267–68 (5th Cir. 2003) (unpublished)[7] (holding that an accounts receivable data entry clerk occupied a position of trust because her position provided her with "special access to the company's data base, with the power to receive, deposit and record substantial sums of money, and with the authority to relay the updated account information to the company's headquarters").

As to the second prong of the inquiry, Miller exploited the knowledge of HSI's internal accounting procedures and access to its accounting records—necessary for her position as the accounts payable clerk—to facilitate and conceal her bank fraud. *See United States v. Powers,* 168 F.3d 741, 752 (5th Cir. 1999); *see also United States v. Pruett*, 681 F.3d 232, 248 (5th Cir. 2012) ("We have found the second element of § 3B1.3 to be satisfied where the defendant's position made the criminal conduct easier to perform or where it facilitated his crime."). This access and knowledge provided Miller with the

---

[7] Although an unpublished opinion issued after January 1, 1996, is not controlling precedent, it may be considered as persuasive authority. *See Ballard v. Burton* 444 F.3d 391, 401 & n.7 (5th Cir. 2006) (citing 5TH CIR. R. 47.5.4).

means to issue fraudulent checks made payable to her boyfriend, Sandifer. Miller's position of trust similarly assisted in her concealment of the fraud: Miller abused her ability to add Sandifer as a vendor-payee, delayed detection by falsely representing in the company's accounting records that Sandifer[8] sold metal to HSI, and disguised the fraudulent checks as legitimate in the list she provided to HSI's bank. The exploitation of this type of unsupervised, specialized knowledge in the commission of the offense supports the abuse of position of trust enhancement. *See Smith*, 203 F.3d at 893 (holding that a part-time bank teller occupied a position of trust because of special knowledge of operating and security procedures, which the teller used to facilitate a robbery); *United States v. Ehrlich*, 902 F.2d 327, 330–31 (5th Cir. 1990) (holding that a loan clerk occupied a position of trust because of specialized knowledge and access of the computer system, as well as the authority to balance large, important accounts, which facilitated her embezzlements, warranting an abuse of position of trust enhancement); *United States v. Nelson*, 487 F. App'x 152, 154 (5th Cir. 2012) (unpublished) (affirming the enhancement where the defendant's position as a liaison between her employer and marketing vendors, "*combined* with her specialized knowledge of [her employer's] invoice-process for marketing services, [ ] provided her with the means and discretion to submit and receive payment for fraudulent invoices").

Additionally, the extent of the fraudulent scheme—in the amount of loss and the length of time—evinces that Miller's position as HSI's accounts payable clerk facilitated Miller's commission and concealment of bank fraud. Because of Miller's concealment efforts, the owners of HSI struggled with the company's inexplicable financial troubles for several months, which resulted

---

[8] HSI did not learn the identity of Sandifer until July 18, 2016: Miller first revealed that Sandifer was her boyfriend when HSI questioned her about the unauthorized checks.

in employees being laid off, withholding of annual bonuses, and the termination of overtime.

For these reasons, the district court's sophisticated factual determination that Miller abused a position of trust is plausible in light of the record, and thus is not clearly erroneous. Accordingly, the district court did not err in applying the § 3B1.3 abuse of trust sentencing enhancement.

II. *Use of Sophisticated Means*

As to Miller's second argument challenging the sophisticated means enhancement, the Guidelines provide for a two-level increase if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. § 2B1.1(b)(10)(C). The term "sophisticated means" is defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id.* at cmt. n. 9(B). "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts [ ] ordinarily indicates sophisticated means." *Id.* We have "affirmed the application of the sophisticated means enhancement in cases involving some method that made it more difficult for the offense to be detected, even if that method was not by itself particularly sophisticated." *United States v. Valdez*, 726 F.3d 684, 695 (5th Cir. 2013) (collecting cases). "We will not find a district court's ruling [that a defendant used sophisticated means to impede discovery of the offense] to be clearly erroneous unless we are left with the definite and firm conviction that a mistake has been committed." *United States v. Clements*, 73 F.3d 1330, 1340 (5th Cir. 1996).

While some aspects of Miller's scheme were not sophisticated, viewing the scheme in its entirety, it was not clearly erroneous for the district court to conclude that Miller's overall conduct warranted the sophisticated means enhancement. Miller employed multiple methods that made it more difficult to

detect her bank fraud. *See Valdez*, 726 F.3d at 695. Specifically, Miller misrepresented her boyfriend as HSI's vendor and created false bookkeeping entries to pay her boyfriend for fictitious metal sales, forging the office manager's signature on the checks she issued. Miller further attempted to disguise her scheme by including the fraudulent checks in the list of authorized checks she submitted to Regions Bank, making them appear legitimate and delaying detection.

Moreover, by issuing the fraudulent checks to Sandifer—a name unknown to HSI—Miller obscured the link between herself and the fraudulent payments. *See Clements*, 73 F.3d at 1340. Miller further attempted to avoid linking herself to the fraudulent checks by continuously depositing the checks into WNB's after-hour drop box. Once WNB became suspicious, Miller composed a letter attempting to provide the bank with the requested verification. When WNB refused the letter because it was not notarized, Miller closed the account and opened a new account at another bank.

Miller's conduct is something more than an "open and transparent direct deposit and movement of funds," *Valdez*, 726 F.3d at 695, and closer to the conduct of defendants in cases where similar enhancements were upheld. *See, e.g., Clements*, 73 F.3d at 1340 (upholding the enhancement where the defendant repeatedly converted payments he received into multiple cashier's checks, which were either cashed or deposited into his wife's separate bank account, because his actions "obscure[d] the link between the money and . . . himself," and "undeniably made it more difficult for the IRS to detect his [tax] evasion"); *United States v. Malfitano*, 690 F. App'x 218, 219 (5th Cir. 2017) (affirming enhancement where, although the defendant provided his true identity, "he attempted to avoid detection and to conceal the fraudulent nature of the transactions at issue, and he attempted to legitimize the proceeds distributed to him through his company"); *United States v. Faulkner*, 598 F.

No. 17-10594

App'x 301 (5th Cir. 2015) (affirming § 2B1.1(b)(10)(C) enhancement where the defendant "created fictitious room revenue credits using the [hotel's] house account and issued these refunds to her personal accounts").

Based on the foregoing reasons, the district court's application of the sophisticated means enhancement was not clearly erroneous.

## CONCLUSION

AFFIRMED.