# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 14, 2024

Lyle W. Cayce
Clerk

No. 23-50602

United States of America,

*Plaintiff—Appellee*,

*versus*

Leslie Robert Burk,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 3:19-CR-1019-1

_____

Before Wiener, Willett, and Duncan, *Circuit Judges*.

Jacques L. Wiener, Jr., *Circuit Judge*:[*]

This criminal appeal arises from a jury verdict against the defendant-appellant, Leslie Robert Burk, and his business partner, Ethan Sturgis Day. Burk raises five issues on appeal that he asserts warrant vacatur of his convictions or, alternatively, their remand for re-sentencing. As we explain below, we AFFIRM his convictions but REVERSE and REMAND for him to be re-sentenced consistent with this opinion.

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 23-50602

## I.

In 2014, Burk and Day went into business together designing and building homes made from ocean shipping containers. Day handled sales and designs out of California, where he resided, and Burk managed the manufacturing, building, and financial aspects of the business out of a warehouse in El Paso, Texas. On the company's website, Burk was listed as the CEO and President of the business, Atomic Container Homes (ACH), while Day was identified as the owner of Atomic Home Designs, the design component of that venture. Day was also listed as the Vice President of Commercial Development and Sales, Executive Manager, and Treasurer of ACH. Throughout the time related to the criminal activity and covered by the indictment, Burk conducted business through other corporate entities as well, including Quantum Stealth Technologies, Atomic Construction, Atomic Container Homes, Inc., American Container Homes LLC, and Universal Container Homes.

On or around June 1, 2017, in response to customer allegations of fraud, the FBI opened an investigation into ACH's operations. Ultimately, a grand jury issued a 33-count indictment against Burk and Day, which included (1) one count of conspiracy to commit wire fraud, (2) eighteen counts of wire fraud, and (3) twelve counts of money laundering. The grand jury also indicted Burk on one count of making a false bankruptcy declaration (count 32) and one count of giving false testimony under oath at his personal bankruptcy proceeding (count 33). The bankruptcy counts relate to Burk's 2018 personal bankruptcy petition and involve his omission and false statement relating to his ownership of four vehicles, which the government characterized as proceeds from the ACH fraud. The FBI also uncovered evidence of additional victims, whose total payments to Burk and Day (together with the victims covered in the indictment) exceeded $2.5 million.

No. 23-50602

The wire fraud and money laundering counts reference Burk's (and Day's) dealings with particular customers, most of whom testified at trial. The fraud itself consisted of misrepresentations, lies, delay tactics, ignoring customers, and refusing to issue refunds. For example:

(1) ACH's website displayed photos of container homes and projects that were not built by ACH and that defendants did not have permission to use;

(2) to appear legitimate, and to lure customers, ACH falsely represented that it had government contracts, including with Orange County, California, Camp Pendleton, FEMA, and the U.S. Border Patrol, when no such contracts existed and when, in fact, Burk had been debarred from contracting for the federal government;

(3) ACH falsely represented that various employees and officers, including members of Burk's family, had credentials that they did not have; and

(4) the website falsely represented that ACH could design and build its product within weeks and that they had ready-to-ship, immediately available containers, when neither claim was true.

When customers complained or asked for status updates, Burk and Day would give them the run around; send them pictures purporting to be of their home in progress but were actually photos of different projects; failed to return customer requests for information citing questionable reasons; and in some cases completely ghosted the customers.

The government's theory of the case at trial was circumstantial but overwhelming. It alleged, and the jury believed, that Burk's extensive use of cash to operate the business, frequent changing of business entity names, use of contracts that consistently underestimated price and timeframe despite

knowing these terms were unrealistic, ghosting of customers, and use of company funds to pay personal expenses together indicated a conspiracy and intent to defraud. Dozens of witnesses testified at trial, including most of the former customers/victims named in the indictment, as well as other aggrieved customers who were not named. Several ACH employees also testified.

In 2018, during the FBI's investigation, Burk filed for personal bankruptcy. He moved to sever the bankruptcy fraud charges from the wire fraud charges in this case, but the district court rejected that attempt because it found a logical connection between the ACH fraud and Burk's personal bankruptcy. Specifically, the district court considered the bankruptcy filing to be an attempt to escape liability from the wire fraud and keep the proceeds.

After an eleven-day trial, the jury convicted Burk of one count of conspiracy to commit wire fraud, twelve counts of wire fraud, and eight counts of money laundering. The jury acquitted him of the wire fraud and money laundering counts relating to one former-customer, Christine Geis (counts 16, 17, and 29).

The Presentence Report (PSR) classified Burk's offense level as 37 and his criminal history category of II. The district court overruled Burk's objections and adopted the PSR. Pertinent to this appeal, the district court applied two upward adjustments when it calculated the offense level: (1) a two-level adjustment for abuse of a position of private trust under United States Sentencing Guideline (U.S.S.G.) § 3B1.3, and (2) a four-level adjustment for a leadership role in a criminal offense involving five or more participants or that was otherwise extensive under U.S.S.G. § 3B1.1(a).

Burk presents five issues on appeal: whether (1) the evidence was sufficient to support his convictions; (2) the district court's jury instructions on the intent to defraud element affected Burk's substantial rights; (3) the

district court erred in denying Burk's motion to sever the bankruptcy; (4) the district court erred in applying a two-level adjustment for abuse of a position of trust; and (5) the district court erred in applying a four-level adjustment for a leadership role. We address each in turn.

## II.

When a defendant has timely moved for acquittal, the appellate court reviews sufficiency of the evidence challenges *de novo*. *United States v. Delgado*, 984 F.3d 435, 446 (5th Cir. 2021) (quoting *United States v. Nicholson*, 961 F.3d 328, 338 (5th Cir. 2020)). "Though de novo, this review is nevertheless highly deferential to the verdict." *Nicholson*, 961 F.3d at 338. "[T]he critical inquiry … [is] to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). The court reviews the "evidence and all reasonable inferences in the light most favorable to the prosecution" and must determine "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Nicholson*, 961 F.3d at 338 (quoting *United States v. Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir. 2014) (en banc)); *Jackson*, 443 U.S. at 319.

Burk contends that there was insufficient evidence to prove the specific intent element of the wire fraud offense, on which all non-bankruptcy-related charges rely.

To convict Burk on the conspiracy charge, the government had to prove that: (1) "two or more persons made an agreement to commit" the crime in question, here, wire fraud; (2) "the defendant knew the unlawful purpose of the agreement; and (3) [] the defendant joined in the agreement with the intent to further the unlawful purpose." *United States v. Sanders*, 952 F.3d 263, 273 (5th Cir. 2020) (quoting *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018)). Circumstantial evidence alone can be enough to

prove a criminal conspiracy because "a jury can infer from the surrounding circumstances whether a defendant participated in and knew of the conspiracy." *Id.*

To prove wire fraud, the government had to show "(1) a scheme to defraud; (2) the use of, or causing the use of, wire communications in furtherance of the scheme; and (3) a specific intent to defraud." *United States v. Spalding*, 894 F.3d 173, 181 (5th Cir. 2018). The first element requires proof of "some kind of a false or fraudulent material misrepresentation." *United States v. Harris*, 821 F.3d 589, 598 (5th Cir. 2016) (quoting *United States v. Curtis*, 635 F.3d 704, 718 (5th Cir. 2011)). A misrepresentation is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Neder v. United States*, 527 U.S. 1, 16 (1999) (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995)). A defendant has specific intent to defraud if he "acts knowingly with the specific intent to deceive for the purpose of causing pecuniary loss to another or bringing about some financial gain to himself." *United States v. Swenson*, 25 F.4th 309, 318-19 (5th Cir. 2022) (internal quotation omitted). The money laundering charges required the government to prove "(1) property valued at more than $10,000 [] was derived from a specified unlawful activity," here, wire fraud, "(2) the defendant's engagement in a financial transaction with the property, and (3) the defendant's knowledge that the property was derived from unlawful activity." *United States v. Evans*, 892 F.3d 692, 708 (5th Cir. 2018).

If Burk lacked the specific intent to defraud, all of his non-bankruptcy-related convictions must be set aside. However, viewing the evidence and all reasonable inferences in the light most favorable to the prosecution, *Nicholson*, 961 F.3d at 338, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

No. 23-50602

Burk's position throughout this litigation has been that he did not intend to deceive and cheat these customers; he always intended to live up to his end of the contract; but he simply overestimated his ability to keep up with the demands of the business. Burk characterized his various misrepresentations as puffery and exaggeration, "things said to buy time," "not stories told with intent to cheat others." Much of Burk's argument is that ACH was "a going concern" which had real employees, real tools, and occasionally made good on contracts for container homes. He contends that there was no evidence from which a reasonable jury could conclude that he and Day agreed to defraud these customers. We disagree.

The government put forth evidence showing that: (1) Day and Burk each sent the same photograph of a container to different customers (Lu and Orange County), knowing it did not depict their container home projects but hoping to mollify the customers' concerns; (2) Burk advertised various government contracts and a contract with the restaurant chain, Rally's Checkers, on the website to make the company appear legitimate and credible; (3) Burk advertised projects that he and Day knew they had not worked on to make the company appear legitimate and to lure customers; and (4) Burk did not disclose that ACH's personnel were not qualified to install basic necessities, like plumbing, despite advertising these capabilities. The government also showed that the cash received by customers was not used to build their container homes but was instead used for Day and Burk's personal expenses. Then, there was the victims' testimony, providing account after account of their "remarkably similar, uncanny" experiences with Burk and Day, including that Burk and Day gave them the run around, failed to return their requests for information, and even completely ghosted them. The jury believed this evidence, but did not believe that Burk was merely a businessman in over his head but trying his best.

7

Viewing the record in the light most favorable to the prosecution, as this court must, this evidence is sufficient for a jury to find beyond a reasonable doubt that Burk had the specific intent to defraud these customers.

## III.

When a defendant does not object to a jury instruction at trial, this court reviews the instruction for plain error. *United States v. Perez-Gorda*, 115 F.4th 653, 656 (5th Cir. 2024); *United States v. Shows Urquidi*, 71 F.4th 357, 372 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 268 (2023) ("Unpreserved evidentiary challenges are reviewed for plain error."). Plain error exists when "(1) there was an error; (2) the error was clear and obvious; and (3) the error affected the defendant's substantial rights." *Shows Urquidi*, 71 F.4th at 372 (quoting *United States v. Jasso*, 587 F.3d 706, 709 (5th Cir. 2009)). An error affects a defendant's substantial rights when the defendant shows "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Perez-Gorda*, 115 F.4th at 656 (quoting *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016)). When all three elements are met, this court may correct the error "only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Quintanilla*, 114 F.4th 453, 465 (5th Cir. 2024) (quoting *United States v. Bohuchot*, 625 F.3d 892, 897 (5th Cir. 2010)).

Because Burk did not object to the jury instruction at trial, this court reviews that issue for plain error. Both parties concede that the jury instruction was a clear and obvious error, but they disagree as to whether it affected Burk's substantial rights.

When instructing the jury on the specific intent element of wire fraud, the trial court told the jury that "a 'specific intent to defraud' means a conscious, knowing intent to deceive *or* cheat someone." The correct

instruction should have been "…deceive *and* cheat someone." *See United States v. Greenlaw*, 84 F.4th 325, 350-51 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 2518 (2024). This court held as much in *United States v. Greenlaw*. Even though *Greenlaw* was decided after Burk's trial, "the 'plainness' of the error should be judged by the law at the time of the appeal." *United States v. Escalante-Reyes*, 689 F.3d 415, 423 (5th Cir. 2012) (en banc).

Burk claims this error was harmful and affected his substantial rights, that is, that it "could have meant the difference between acquittal and conviction" because, under the incorrect disjunctive instruction, the jury could have found him guilty of fraud only for his deceptions. According to Burk, the jury could have found that he had the specific intent based only on the misrepresentations on the ACH website "because it could have concluded that he intended to deceive the website viewer or customer about one of those things." This is not enough, as the deception must be made with the intent to defraud—the intent to "cheat" someone. *See Greenlaw*, 84 F.4th at 350-51.

Looking at the entire charges, the arguments made to the jury on those charges, and the trial evidence, we conclude that the error was not harmful because the jury adequately understood that a deception alone was not enough to sustain a conviction—that it must be a deception made with the specific intent to cheat. *See United States v. Fairley*, 880 F.3d 198, 210-11 (5th Cir. 2018) ("We review claimed deficiencies in a jury charge by looking to the entire charge as well as the arguments made to the jury.") (quoting *United States v. Chagra*, 807 F.2d 398, 402 (5th Cir. 1986)). The district court read to the jury each wire fraud count, stating each time that "the defendants, in execution and in furtherance of the scheme and artifice to defraud *and to obtain money by means of false and fraudulent pretenses and representations*, caused to be transmitted by means of wire" the sums in question. That court instructed the jury that a "scheme to defraud" meant "any plan, pattern, or

course of action *intended to deprive another of money or property or bring about some financial gain* to the person engaged in the scheme." The prosecutor characterized the fraud charges as a "three-legged stool," with the first leg being a false statement, the second leg being that "the *purpose* of the false statement is to obtain something of value," and the third leg, "which is significant, is intent. Fraudsters have to have the intent to carry out the deception, to know that what they said to the victims wasn't true, and perpetuate the false statement *to get a thing of value, that is, the victim's money.*"

Furthermore, the jury acquitted Burk on several wire fraud and money laundering counts relating to former customer Christine Geis. If the jury had understood the disjunctive instruction to permit a conviction on deception alone, it would have convicted Burk on these counts as well, because Geis relied on the website deceptions—the photos of products purported to be by ACH—when she agreed to contract. That deception alone was not enough for the jury to convict Burk on these counts, and this demonstrates that the jury did not apply the erroneous disjunctive statement of the law when reaching its verdict. *See Greenlaw*, 84 F.4th at 352 ("Because any error did not contribute to the verdict obtained, the conviction can stand.") (cleaned up).

Burk's arguments at trial focused on his claimed lack of intent to deprive people of property. On appeal, Burk acknowledges that he exaggerated, misrepresented, and puffed up various aspects of his business to attract customers. The jury was aware of those various deceptions. Nevertheless, Burk's position throughout trial was that he had no intent to deprive those customers of their money *when he made these deceptions* and thus he had no intent to cheat them. The jury bought that argument with respect to Christine Geis, but did not with respect to the other victims named in the

indictment. This shows that the jury understood that more than deception was required to convict.

Given the extent of the evidence at trial, we hold that the erroneous instruction did not impact Burk's substantial rights. He did not show a "reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Perez-Gorda*, 115 F.4th at 656. We AFFIRM.

IV.

We "review denial of a motion to sever for abuse of discretion." *United States v. Huntsberry*, 956 F.3d 270, 287 (5th Cir. 2020). "Whether the initial joinder of charges was improper under Rule 8 of the Federal Rules of Criminal Procedure is judged according to the allegations in the superceding [sic] indictment." *United States v. Butler*, 429 F.3d 140, 146 (5th Cir. 2005) (per curiam). Joinder is proper when the offenses charged "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." *Id.* (quoting FED. R. CRIM. P. 8(a)). This court has construed Rule 8 broadly in favor of joinder, recognizing a "flexible" view of the transaction requirement. *Id.* (citing *United States v. Fortenberry*, 914 F.2d 671, 675 (5th Cir. 1990)). We have also held that a transaction "may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Fortenberry*, 914 F.2d at 675 (quoting *United States v. Park*, 531 F.2d 754, 761 (5th Cir. 1976)).

When joinder is proper, a denial of a motion to sever "will not warrant reversal unless clear prejudice is shown." *Park*, 531 F.2d at 761. To demonstrate clear prejudice, the defendant must show "specific and compelling prejudice which results in an unfair trial." *United States v. Ballis*, 28 F.3d 1399, 1408 (5th Cir. 1994). This requires "something more than the fact that a separate trial might offer him a better chance of acquittal."

*Huntsberry*, 956 F.3d at 287 (quoting *Ballis*, 28 F.3d at 1408). Joinder could be improper, and severance warranted, if the evidence at trial clearly shows that the counts are "insufficiently linked" to one another. *See United States. v. Diaz-Munoz*, 632 F.2d 1330, 1336 (5th Cir. 1980) (discussing how the district court gave the defendants' counsel the opportunity to move for severance when it became clear that the counts were insufficiently linked, but they declined to do so).

Burk moved to sever the two counts relating to his personal bankruptcy proceeding but the district court declined to do so. It held that (1) joinder was proper because "the bankruptcy proceedings are connected with and constitute a part of a scheme or plan Burk is alleged to have devised[;]" (2) their inclusion does not violate F.R.E. 404(b) because the government is offering evidence for an admissible purpose—intent; (3) joinder is not prejudicial because a limiting instruction can cure any propensity concerns; and (4) joinder is not confusing because the government "has already shown how its theory of the case ties Burk's bankruptcy proceedings with the remaining counts." Burk asserts that the court abused its discretion when it denied his motion to sever and that the improper and prejudicial joinder is reversible error.

Burk contends that the testimony of the bankruptcy trustee, Ronald Ingalls, did not establish any common scheme with the wire fraud. However, in its closing argument, the government emphasized the overlapping time frame between the bankruptcy and the purchase of the vehicles in question. This was the same time frame when the FBI was investigating Burk, when Burk instructed ACH employee Iliana Velasquez to remove "Atomic" and "American" from the company names and operate instead as "Universal," and when the ACH accounts were frozen. This is not "specific and compelling prejudice which result[ed] in an unfair trial." *Ballis*, 28 F.3d at 1408.

Burk ultimately relies on *United States v. Diaz-Munoz* to support his claim that, when the common scheme is not shown at trial, joinder is rendered improper and prejudicial. *See Diaz-Munoz*, 632 F.2d at 1336 (discussing how the district court gave the defendants' counsel the opportunity to move for severance when it became clear the counts were "insufficiently linked," but counsel declined). However, viewed together, the time frame for Burk's bankruptcy petition, his purchase of the vehicles, his false statements before the bankruptcy proceeding regarding those vehicles, and his changing of ACH's entity name—all during mid-2018 while the FBI investigation was ongoing—sufficiently link the bankruptcy counts to the wire fraud counts. We hold that joinder was proper: The evidence at Burk's trial adequately connected those counts. Finding no abuse of discretion, we AFFIRM the district court's denial of Burk's motion to sever.

## V.

Finally, we turn to the district court's application of offense-level adjustments under the United States Sentencing Guidelines (U.S.S.G.). Burk appeals the district court's application of the two-level adjustment to his offense level for his abuse of a position of trust under U.S.S.G. § 3B1.3. He asserts that he was not in a position of trust as contemplated by the Guidelines or the caselaw on this adjustment. He also appeals the district court's application of the four-level adjustment for a leadership role under U.S.S.G. § 3B1.1. We address the leadership adjustment first.

"The application of § 3B1.1," the organizer/leader adjustment, "is a factual finding reviewed only for clear error." *United States v. Fullwood*, 342 F.3d 409, 415 (5th Cir. 2003). Under the clear error standard, the court "will uphold [the enhancement] so long as it is plausible in light of the record as a

whole." *United States v. Miller*, 607 F.3d 144, 148 (5th Cir. 2010) (quoting *United States v. Ekanem*, 555 F.3d 172, 175 (5th Cir. 2009)).

The district court applied the four-level adjustment under § 3B1.1 for Burk's leadership role in "criminal activity that involved five or more participants or was otherwise extensive." U.S. Sent'g Guidelines Manual § 3B1.1(a) (U.S. Sent'g Comm'n 2023). The district court did not expressly state whether the adjustment was applied because there were five or more participants, or because the criminal activity was otherwise extensive. In its brief, the government seemed to argue that both are satisfied, however, it conceded during oral argument that the criminal activity here did not involve 'five or more participants' as defined by the Guidelines. We agree that there is no support in the record or caselaw for the "five or more participants" prong, but we AFFIRM on the basis that the criminal activity was "otherwise extensive."

The Guidelines' commentary states that, in determining whether it is otherwise extensive, "all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." *Id.* § 3B1.1 cmt. n.3. In light of the (sometimes unknowing) services of many outsiders evidenced in the record (shippers, employees, designers, the various state and local permitting offices), it was plausible—and therefore not clearly erroneous—for the district court to apply this adjustment. We AFFIRM.

Now, we turn to whether Burk occupied a position of trust. This adjustment is applied if the defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S. Sent'g Guidelines Manual § 3B1.3. Courts in this circuit apply a two-part test to determine

whether this adjustment is appropriate: first, the sentencing court must "determine whether the defendant occupied a position of trust at all," and second, "the court must ascertain the extent to which the defendant used that position to facilitate or conceal the offense." *United States v. Miller*, 906 F.3d 373, 377-78 (5th Cir. 2018) (cleaned up). The first inquiry is reviewed *de novo* and the second for clear error. *United States v. Kay*, 513 F.3d 432, 460 (5th Cir. 2007).

"A position of trust is characterized by (1) professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference), and (2) minimal supervision." *Miller*, 906 F.3d at 377 (quoting *United States v. Ollison*, 555 F.3d 152, 166 (5th Cir. 2009)). A "primary trait" in this analysis is "the extent to which the position provides the freedom to commit a difficult-to-detect wrong." *Id.* (internal quotation omitted).

We hold that Burk did not occupy a position of trust. It is true that Burk's position as CEO and President made his misrepresentations difficult to detect. For instance, former customer and victim Laurie Olson had difficulty detecting the misrepresentations in the private placement memo Burk sent her, given her lack of access to ACH's true financials. However, the cases the government cites deal primarily with abuse of *public* trust—Medicare fraud, *Miller*, 607 F.3d at 148, AmeriCorps fraud, *United States v. Buck*, 324 F.3d 786, 789 (5th Cir. 2003), and bribery to the government of Haiti, *Kay*, 513 F.3d at 439.

We also note that the comments to § 3B1.3 provide examples that do not map perfectly onto the facts of this case. For example, positions of trust that rely on a "special skill" include "pilots, lawyers, doctors, accountants, chemists, and demolition experts." U.S. Sent'g Guidelines Manual § 3B1.3 cmt. n.4. The common feature we identify in these

examples is professionalization or licensure establishing a measure of private trust between the provider of these services and the client, or a measure of public trust because of the importance of the role to public safety. Furthermore, in defining "public or private trust," the Guidelines' notes explain that the adjustment would apply to "an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician." *Id.* § 3B1.3 cmt. n.1. In those examples, there is a private trust relationship based on some level of fiduciary or confidentiality duty. The adjustment would also apply when a defendant "perpetrates a financial fraud by leading an investor to believe the defendant is a legitimate investment broker" or when a defendant "perpetrates a fraud by representing falsely to a patient or employer that [he] is a licensed physician." *Id.* § 3B1.3 cmt. n.3. Again, a common theme is either the (fraudulently implied) fiduciary trust relationship or the reliance on a professional or licensing scheme. Burk contends that all of these comments demonstrate a trust relationship that exceeds the bounds of a regular business contract requiring no special skill and that the cases the government cites are distinguishable. We agree.

For example, in *United States v. Miller*, the defendant operated a medical supply company in Houston, Texas. 607 F.3d at 147. She was licensed by Medicare and Medicaid to provide devices to patients "upon certification of medical necessity [] by a licensed physician." *Id.* Miller asserted that she was merely "an ordinary vendor in an arm's length commercial relationship with the government," because "the government's trust [was] placed in physicians" who performed the certification, but we rejected that contention. *Id.* at 148-49. We reasoned that Miller "assumed the position of the certifying physician" when she obtained and completed pre-authorized, blank certification forms into which she would insert patient names. *Id.* at 149-50. Furthermore, "the *government* entrusted her to provide

good faith, accurate information in seeking reimbursement from Medicare and Medicaid." *Id.* at 150 (emphasis added).

In *United States v. Buck*, the defendant was convicted of "misapplying federal funds and submitting false documents" in connection with the AmeriCorps grant program. 324 F.3d at 789. She appealed the application of the abuse-of-trust adjustment to her sentence, alleging the adjustment cannot be applied to fraud convictions because "all fraud includes an abuse of trust" and it is already a part of the base offense level for the crime of fraud. *Id.* at 792. Like in *Miller*, Buck argued that her position of trust was not to the government, but rather to a nonprofit through which federal grants were channeled. *Id.* at 794. We rejected that contention, observing that she "maintained significant direct ties to the government in directing the AmeriCorps program." *Id.* In both *Miller* and *Buck*, our focus was on the defendants' "discretion and ability" to conceal the fraud. *See id.*; *Miller*, 706 F.3d at 149. In both cases, however, there was a trust owed to a public, governmental entity by the defendant's business.

Burk's case is distinguishable. Burk was in an ordinary, arm's length commercial relationship with his customers, and he was not trusted with reporting accurate information to the government or purveyors of government funding. *See Miller*, 607 F.3d at 148. His position was not specialized, like an accountant or physician. *See* U.S. Sent'g Guidelines Manual § 3B1.3 cmt. n.4. Neither does the public "place[] tremendous trust" in regular, unspecialized, commercial businesses, at least as compared to prison employees, *United States v. Brown*, 7 F.3d 1155, 1161 (5th Cir. 1993), pilots, U.S. Sent'g Guidelines Manual § 3B1.3 cmt. n.4, or nonprofits administering federal grants, *Buck*, 324 F.3d at 789.

It is true that Burk was in a position from which he made representations about his expertise at building container homes and his

company's financial viability and legitimacy. It is also true that these facts would be difficult to verify or detect—for example, the district court observed that no one would be able to verify that Burk had contracts with the CIA, as he had purported. Burk also was not subject to supervision that would detect this behavior, and he had a substantial amount of discretion and ability to conceal his fraud.

But our precedent requires more. Consider the following hypothetical. A general contractor owns his own business and employs a small number of people. He is the president of his small business. He induces a customer to enter a contract for services which he knows he will either not perform or perform substandard. Would the customer, an average homeowner with little contracting know-how, have difficulty detecting the contractor's fraud? Probably. Did the contractor have discretion and ability to conceal the nature of his fraud? Probably. As the owner of his small business, would he be subject to supervision that could detect his fraud? Probably not. But the Guidelines' commentary and our caselaw on this adjustment do not support applying this adjustment in such a case because there is no abuse of public trust, there is no special trust placed in home contractors as there are prison employees or pilots, this is not a specialized or licensed skill like an accountant's or lawyer's, and there is no fiduciary or confidentiality duty applicable to the contract for services. To apply § 3B1.3 to Burk would be closer to this hypothetical than to the cases to which the government cites—*Miller*, *Buck*, and *Kay*. We decline to apply § 3B1.3 here and therefore REVERSE and REMAND for re-sentencing without this adjustment.

## VI.

We AFFIRM Burk's convictions because (1) there was sufficient evidence for a reasonable jury to convict him beyond a reasonable doubt, and

No. 23-50602

(2) the erroneous jury instruction did not harm Burk's substantial rights. We AFFIRM the district court's denial of Burk's motion to sever the bankruptcy charges. And we AFFIRM the district court's application of the leadership adjustment under U.S.S.G. § 3B1.1 because the criminal activity was otherwise extensive. However, we REVERSE the district court's application of the abuse of a position of trust adjustment under U.S.S.G. § 3B1.3 and REMAND for re-sentencing consistent with this opinion.